[Civ. No. 13044. First Dist., Div. Two. Sept. 23, 1946.]

W. RENE WAGNER, as Executor, etc., Appellant, v. MARGIE WORRELL et al., Respondents.

Brobeck, Phleger & Harrison for Appellant.

Athearn, Chandler & Farmer, Hoffmann & Angell and Earl C. Berger for Respondents.

GOODELL, J.—This is an appeal from a judgment in favor of the defendants in a suit brought by the estate of Walter D. Wagner, to quiet title to certain office furniture, equipment and insurance records and to $4,092.38 in bank, title to all of which is claimed by respondent association. The contest is now confined to the bank account, for the appellant's claim to the other property has been abandoned.

The association, composed of about 111 irrigation districts in this state, was organized in the early 1920's for the purpose of cooperation between the districts, and to promote their interests, legislative and otherwise. The decedent was its secretary from its early days (when he operated from his home in Merced at a nominal salary) until his death in 1944. About 1929 its office was moved to San Francisco.

In 1927 it was determined that the various purposes of the association would be better served by increasing its income so that a full-time executive secretary could be adequately compensated, and that this could be accomplished without increasing the dues, by handling the insurance and bonds of

the member districts through the association. Such plan actually *reduced* the members' dues. Accordingly, the decedent was requested to obtain, in his name, a license as an insurance agent. In 1928 meetings were held between the decedent and other representatives of the association and the attorney general and representatives of the Insurance Commissioner, at which the proposed plan was discussed, and on September 3, 1928, the following letter was written by decedent to the attorney general:

"In accordance with our conversation of last Saturday, I am writing you in regard to the plan of the Irrigation Districts to secure all their surety bonds through one source. We already know that such a plan will result in lower rates of insurance and other advantages to the districts.

"The following are the facts and the plan proposed: . . .

"The Association elected and employs W. D. Wagner as secretary of the association and pays him a certain salary, and also pays other expenses.

"The law provides that certain officers of an irrigation district shall furnish surety bonds and the district pays the premium on the same.

"The said W. D. Wagner has been regularly appointed as an agent of certain insurance companies and as such agent will receive certain commissions on insurance business.

"It is proposed that the Irrigation Districts shall place or secure the bonds of their officers and certain other bonds or insurance through the said W. D. Wagner, the districts paying the same premium for their bonds as they would were they secured through any other agent.

"The said W. D. Wagner will apply the commissions thus received by him as agent of the insurance company toward the salary agreed to be paid him by the association, or toward any other expenses of the association.

"This will result in its being possible, but not necessary, for the association to ask the districts for less dues or other contributions than formerly, for the support of the association . . .

"The question is: Is this or could this be construed as being an illegal rebate to the district, or in any way impairing the obligation of any bond? . . .

"The fact that the district places its insurance through W. D. Wagner, who is an agent of an insurance company, and who happens also to be the secretary of the Irrigation Districts

Association, and Wagner chooses to use the commissions received as agent to pay the salary of his secretary, or to pay any other expenses of the association, thereby making it possible for the association to conduct its business with less voluntary contributions from the district, can in no way be considered as a rebate to the district on its insurance. . . ."

The attorney general replied that he saw nothing illegal about the plan. It was put into effect and operated about as follows: A district would communicate with decedent at the association's office and he would have the insurance policy or bond written. Bills for premiums were made out in the name W. D. Wagner, Broker, but on the letterheads of the association. Checks or warrants of the districts for premiums, payable in most instances to the association but occasionally to the decedent, were deposited in a commercial account in the Wells Fargo Bank in the name "W. D. Wagner, Insurance Account." Against this account decedent drew checks in payment of the premiums, after deducting commissions. Out of the commissions thus earned (and the receipts from dues) there were paid the decedent's salary, the salary of his assistant, Mrs. Worrell, the office rent, telephone service, stationery and supplies, travelling expenses, automobile expenses, in short all outlays connected with the running of the association *in all its activities.*

This procedure continued for 11 years and more—at least from 1933 to decedent's death in March, 1944. In 1943 decedent's son (the executor-appellant) was employed by the association as his father's assistant *and his salary, also, was paid by the association.* One of his duties was to drive his father on association business, including insurance, in an automobile owned by the association.

All correspondence relating to insurance was written on the association's letterheads for decedent had none of his own. Decedent's name did not appear on the office door as an insurance agent or broker. *The fees for decedent's licenses were paid out of association funds.*

From appellant's own testimony it appears that at no time did his father draw for living expenses or other needs anything in excess of his monthly salary, which was $350 a month at the beginning but $500 latterly (and expenses).

Whatever insurance or bonding business was handled by decedent other than for the association was negligible—mostly

for members of his family. He had no general outside business. His arrangement with the association called for his full-time services as its secretary.

Shortly after the insurance business was started the association employed an accountant to devise a bookkeeping system for the association *in all its activities*. He set up three controlling accounts, (1) the general fund, (2) the district welfare fund, and (3) the insurance fund. It was in and out of this insurance fund that all commissions passed. This accounting system has prevailed ever since 1928 or 1929.

In 1933 the association's commercial account was transferred from another bank to the Wells Fargo Bank, where it has ever since been carried. When this was done a written authorization was required by the bank, and the following letter dated March 24, 1933, on the letterhead of the association was written:

"Wells Fargo Bank & Union Trust Co.
San Francisco, Calif.
"Gentlemen:

"The following resolution was adopted by the executive committee of the Irrigation Districts Association of California on the 18th day of March 1933:

### "RESOLUTION

"RESOLVED: That W. D. Wagner, Secretary, be and he hereby is authorized and directed to endorse checks made payable to the Irrigation Districts Association of California and to deposit the same in accounts designated, Irrigation Districts Association of California and/or W. D. Wagner, Insurance Account, and to withdraw the same on checks signed Irrigation Districts Association of California by W. D. Wagner, Secretary, or W. D. Wagner, Insurance Account.

Very truly yours,

W. D. Wagner
Secretary
IRRIGATION DISTRICTS ASSOCIATION
OF CALIFORNIA

A. B. Tarpey President
IRRIGATION DISTRICTS ASSOCIATION

"WDW:R     OF CALIFORNIA"

The initials "WDW:R" in the corner would indicate that the decedent himself prepared the letter.

At the time of decedent's death there was a balance of $10,596.41 in this account. By agreement of the litigants $6,504.03 was withdrawn to pay outstanding liabilities of the business, leaving the balance, $4,092.38, now in litigation.

After the insurance business had been running for several years it was decided that a working fund was required. Accordingly, on October 31, 1931, $5,000 then on hand was placed in a special interest-bearing savings account in the Hibernia Bank, $1,000 of which was allocated to the general fund and $4,000 to the insurance fund on the books of the association. This special deposit was in the name of "W. D. Wagner, Special Account." At the San Jose convention in 1943 (the last meeting attended by decedent) it was suggested that to obviate any question in the event of decedent's death this fund should be put into the name of the association, and this was done.

Appellant testified to a conversation during the San Jose convention wherein he admitted that this $4,000 belonged to the association. In its cross-complaint the association pleads that this $4,000 "is the account mentioned and described in paragraph II" of the plaintiff's second count. This was denied for want of information or belief, but the court found in accordance with the association's allegation.

The association held two meetings or conventions each year. At one of these the decedent would submit and personally read a full report of all phases of the association's activities for the past year including the insurance business. He would at the same time submit a full accounting of all the association's activities during the year *including the insurance business,* supported by vouchers which accounting would be checked by an auditing committee of the association. These reports were distributed among the members.

There is no evidence that the decedent ever claimed that the insurance business was his own. The witnesses Kidd, Durbrow, Wisler and Worrell all testified to this effect. Kidd testified that at the meeting of the executive committee in September, 1943, appellant acknowledged to him that the insurance business belonged to the association. Wisler testified that decedent told him the commissions belonged to the association; that the money was the association's but was carried in his name because the license was in his name—that he was acting for the association.

The record shows that the expenses of the association always exceeded the net insurance commissions. Decedent's salary alone was $500 a month and the net commissions never came to that much. In 1942 the net insurance commissions were $3,639 and in 1943, $3,686.

The only conflict in the whole case arises from testimony given by the appellant that at the San Jose convention in 1943 L. D. Thompson, an officer of the association, told him "We have always felt that [the insurance] was your father's own private business." Thompson flatly denied this, stating that he had made no statement respecting the ownership of the insurance account.

So strongly did all this evidence impress the trial judge that at the close of the evidence he remarked: "As far as the facts are concerned, the Court is prepared to state the preponderance of the evidence indicates the money was intended to be and always was the fund of the association and not the private fund of Mr. Wagner. That matter is settled. I don't want any argument on that. . . ."

The position first taken by the appellant is that the court should have concluded that the fund belonged to the decedent because he was conducting the insurance business as his own and such conclusion would make the arrangement between decedent and the association " 'lawful, operative, definite, reasonable, and capable of being carried into effect' " (*Robbins* v. *Pacific Eastern Corp.*, 8 Cal.2d 241, 273 [65 P.2d 42]). But the trial court could not possibly have found on this record that the insurance business was the decedent's own, for the evidence is practically all one way that for 16 years decedent consistently carried on the business for the use and benefit of the association. It is needless to repeat the facts already narrated. Five incidents are sufficient: 1st, the opening of the bank account *by the association* with *its* authorization respecting the handling of the account (prepared by decedent and signed by him as secretary), which would have been wholly inexplicable had it been the decedent's own money; 2d, the fact that decedent never drew out a cent in excess of his stated salary; 3d, the carrying of the insurance fund as one of the three controlling accounts, as an integral part of the accounting system of the association; 4th, the transfer back of the $4,000 working fund; and 5th, the annual accounting by decedent as secretary of the association to the general membership thereof, of the insurance business. All

these things were so inconsistent with the idea that the insurance business belonged to decedent that the trial court could not have conceivably concluded otherwise than it did, namely, that the decedent was trustee of the bank account ''for the benefit of the Irrigation Districts Association of California, and not otherwise.''

Whether the plan, and the way it operated, was within the law or in circumvention of it, is another question.

The appellant contends that the arrangement between decedent and the association violated the Insurance Code. This illegality was pleaded in appellant's answer to respondents' amended cross-complaint but the court found against appellant on that point. The sections relied on are 755 which provides that, ''The paying or allowing of any commission or other valuable consideration on insurance business in this State to other than an admitted insurer or a licensed insurance agent, broker or solicitor is an unlawful rebate,'' and 1642 which provides that, ''A person shall not act as an insurance agent, broker, or solicitor until a license is obtained from the commissioner, authorizing such person so to act.'' The respondents tacitly concede that the arrangement was illegal by invoking the rule found at 6 California Jurisprudence 160 that, ''When an action is not to enforce an illegal contract, but is to establish title to property acquired under it, the action may be maintained . . .'' and by reliance on the case of *Wayman Investment Co.* v. *Wessinger,* 13 Cal.App. 108, 109 [108 P. 1022].

Without deciding whether this case comes within that rule, it is sufficient to say that the appellant, who is the moving party herein, ''must recover upon the strength of his own title'' (22 Cal.Jur. 167) and in doing so, it goes without saying, he cannot rely on underlying and inherent illegality. Decedent was one of the leaders in launching the plan and *the* leader in operating it. In appellant's brief this is said: ''If we assume that the insurance business was operated for the Association, the decedent may have been equally guilty in conducting an illegal transaction.'' This is a concession that decedent was *in pari delicto* (6 Cal.Jur. 156). The court has found, on abundant evidence, that the insurance business was so operated.

This suit to quiet title to personal property is of course subject to the same rules as those prevailing in similar suits

respecting real property, and the rule is settled by a long line of cases that when it has been determined that the plaintiff in a quiet title suit has no interest in the property in controversy " 'the case is ended. . . . The want of title in plaintiff renders it unnecessary to examine the title of defendant. . . .' " (*Denman* v. *Smith*, 14 Cal.2d 752, 758 [97 P.2d 451].) To paraphrase the language in *Rockey* v. *Vieux*, 179 Cal. 681, 683 [178 P. 712], "having shown no interest . . . [in the fund] . . . the plaintiffs are not aggrieved by a judgment declaring someone else to be the owner." The failure of the plaintiff to establish his own title eliminates him as a claimant to the fund in question.

The $4,092.38 in the Wells Fargo Bank stands in the name "W. D. Wagner, Insurance Account" but the trial court found that the decedent was trustee of this account for the benefit of the association. In the closing brief counsel say: "The funds on deposit are in the possession of the Bank, having been placed there by the decedent in an account in his own name." The answer to this is that the record clearly shows that *the account was opened by the association when the written authorization of March 24, 1933, signed by the decedent himself, as secretary of the association, was lodged with the bank.* Further, they say ". . . The Association cannot recover against the Bank because payment by the Bank to the Association would be an illegal act." The depositary bank (which has filed a disclaimer) is not concerned with the transaction or arrangement which produced the fund. It has not pleaded illegality and could not do so, for it was not a party to it. Its duty is to pay the money to its depositor (4 Cal.Jur. 246; see, also, *Kyne* v. *Kyne*, 16 Cal.2d 436, 440 [106 P.2d 620]), and there can be no question that the association was and is such depositor.

Furthermore, this is not an action *to enforce a contract.* It is a suit brought to determine the ownership of a fund of money the origin of which was a course of conduct lasting for 16 years, but long since terminated by the death of the appellant's testator. There is nothing executory about it. Whatever the arrangement was, whether legal or illegal, it has been wholly executed and closed. The case is therefore unlike the cases cited by appellant (*Fewel & Dawes, Inc.* v. *Pratt*, 17 Cal.2d 85 [109 P.2d 650]; *Carrier & Braddock* v. *S. W. Straus & Co.*, 213 Cal. 508 [2 P.2d 811]; *Wise* v. *Radis*, 74 Cal.App. 765 [242 P. 90]; *Firpo* v. *Murphy*, 72 Cal.App. 249 [236

P. 968]; *Del Rey Realty Co.* v. *Fourl,* 44 Cal.App.2d 399 [112 P.2d 649]) which were actions to enforce illegal contracts in one way or another.

■ The appellant contends that decedent's letter of September 28, 1928, should have been admitted. The court reserved a ruling which was never made. In this discussion, however, we shall treat the question as if the court had made a formal ruling rejecting it.

On September 3, 1928, the decedent, acting in conjunction with his executive committee, wrote the attorney general that "The said W. D. Wagner will apply the commissions thus received by him as agent of the insurance company toward the salary agreed to be paid him by the association, or toward any other expenses of the association."

Three weeks later, on the 28th, the decedent wrote the assistant commissioner of insurance "I am carrying on a general insurance business" and *"No part of the premium, or of the commission* received by me is paid back to the district, nor is any part of it paid in to the funds of the association" (emphasis his).

There is nothing in the record to show whether the executive committee knew anything about this letter of the 28th, and appellant frankly concedes that whether the association had such knowledge will never be known.

The statements in the letter of the 28th are self-serving for they claim the commissions as the decedent's own. They are, moreover, entirely inconsistent with the representations made by him in his letter three weeks earlier to the attorney general, *of which his executive committee admittedly had full knowledge.* It is frankly admitted by counsel for appellant that "as a general rule the declarations of a deceased person in support of his own interests are not admissible" but they claim that the letter was admissible, (1st), "as a declaration forming part of the transaction sought to be proved" (Code Civ. Proc., § 1850), and (2nd), because "it explains declarations claimed by the defendants to be against the decedent's interest," in other words as an off-set to the self-disserving statements contained in the earlier letter.

Speaking of testimony admissible under section 1850, 10 California Jurisprudence 1111 says: "The propriety of such testimony, and, indeed, the theory upon which it is taken out of the general rule against hearsay, proceeds upon the sup-

position that declarant . . . has spontaneously made some statement which tends to explain the nature, quality, motive or intent of the transaction. . . .''

The proffered letter does not meet this test. The period of 25 days elapsing between the two letters does not argue for spontaneity, nor does the self-serving character of the letter. The second letter was no more a ''verbal act'' forming ''a part of a transaction'' than was the first. Each of them simply purported to inform a state official how certain funds were handled. It served ''merely as an ordinary hearsay assertion of what has [had] been already done'' (VI Wigmore on Evidence (3d ed.) § 1776; see, also, *Estate of Gleason,* 164 Cal. 756, 763 [130 P. 872]) for it showed that decedent was already ''carrying on a general insurance business.'' Indeed decedent's letter to the attorney general showed that he had theretofore ''been regularly appointed as an agent of certain insurance companies.'' As early as May 11, 1928, decedent was requested by the association ''to so qualify as to be able to handle this insurance,'' and the minutes of the executive committee, signed by decedent, read into the record, showed ''that *since August 1, 1928,* the secretary had taken in commissions on insurance in the sum of $1,312.19.'' (Emphasis added.) While it is true the court found ''that the insurance business commenced about September, 1928'' the undisputed evidence indicates that neither letter was written in the middle of any transaction, as was the case in the declarations made in each of the cases cited by appellant.

What has been said under the first point answers the second, for the proffered letter did not pretend to *explain* the declarations contained in the earlier letter; *it simply contradicted them.* We are satisfied that the letter of September 28 was not entitled to be admitted.

■ The judgment in paragraph (2) declares ''(a) That the plaintiff W. Rene Wagner forthwith turn over and deliver to the defendant . . . Association . . . all records, books, chattels, and other personal property described in the complaint and amended cross-complaint.'' There is no allegation or prayer in the amended cross-complaint upon which such order could have been based. Such was substantially the case in *Warden* v. *Stoll,* 210 Cal. 374 [291 P. 835] where, in a quiet title suit, the decree went beyond the prayer of the answer and attempted to award affirmative relief. In that case it was held that the plaintiff was ''not injured by the portion of the

decree awarding the respondents affirmative relief'' the court saying (p. 377) ''A simple judgment in a quiet title action in favor of the defendant, that is a judgment that plaintiff take nothing by his said action and that the defendant recover his costs, operates as an estoppel upon the plaintiff and determines title as between the parties and protects the defendant against any claim of the plaintiff as fully as would an affirmative decree in his favor. (*Larkin* v. *Superior Court,* 171 Cal. 719 [Ann.Cas. 1917D, 670; 154 P. 841]; *Wilson* v. *Madison,* 55 Cal. 5, 8; *Miller* v. *Luco,* 80 Cal. 257, 261 [22 P. 195]; *Booth* v. *Stow,* 38 Cal.App. 191 [175 P. 705].) The insertion, therefore, in the decree in this action of a provision awarding the respondents affirmative relief against the appellant, while erroneous, does not prejudice the appellant in any of her substantial rights and may be regarded as surplusage.'' The same may be said here.

Moreover it clearly appears from the record that the appellant during the trial abandoned all claim to the movable personal property.

The judgment is affirmed.

Nourse, P. J., concurred.