[Civ. No. 13972.   First Dist., Div. One.   Aug. 10, 1949.]

GERALD NORWOOD, Appellant, v. FRED T. JUDD, Respondent.

Bernal & Bernal for Appellant.

Ralph Nathanson and Marshall Rutherford for Respondent.

PETERS, P. J.—Plaintiff, Gerald Norwood, brought this action against his partner in the contracting business, Fred T. Judd, for a dissolution of the partnership and for an accounting. It was stipulated that a partnership existed between the parties, and that the main issues to be decided by the trial court were when the partnership began, and when, if at all, it terminated. After the two parties had presented all of their evidence on these issues, the court, on its own motion, requested counsel to brief the questions, not theretofore raised by either party, as to whether a partnership

license was required, and whether the failure to secure such a license would prevent the plaintiff from recovering in the action. Thereafter, the court determined that a partnership license was required and had not been secured, that the two parties had therefore engaged illegally in the contracting business, and that, for this reason, plaintiff was not entitled to the aid of a court of equity. Judgment was entered accordingly, and plaintiff appeals.

It is admitted that on June 4, 1942, Norwood and Judd entered into a partnership agreement to conduct the general contracting business of sandblasting and painting, and to share profits equally. Judd had over 20 years' experience in this field. Norwood was Judd's brother-in-law, and was an auto mechanic. He had no experience as a sandblaster or painter. Each partner contributed cash and equipment to the new enterprise. Norwood handled the bookkeeping and accounting and a few minor jobs, while Judd supervised the actual construction work and computed the bids. Because of his experience in this type of business, because of his many friends in the industry, and because he actually performed or supervised the work of the partnership, it is quite clear that Judd contributed more to the partnership than did Norwood.

In June, 1942, Judd applied for, and secured, from the proper state department, a contractor's license in his own name, but failed to apply for, or to secure, such a license in the name of the partnership. On April 15, 1943, at the request of Judd, the name of the licensee was changed to Fred T. Judd Company, but the application failed to disclose that the company was a partnership. It is admitted that the Contractor's License Board was never informed that Norwood had an interest in the business.

In August, 1942, Norwood became ill and stayed away from work until February, 1943. At that time the partners agreed that Norwood's share of the profits and his interest in the partnership should be reduced to one-third.

The partnership engaged in the business of sandblasting and spray painting. Most of its jobs were secured as the result of competitive bidding. Judd testified that about 60 per cent of their work was performed for government agencies, 30 per cent for large corporations, and the other 10 per cent small jobs that came in without solicitation. In addition, the company also developed, manufactured and sold or leased

sandblasting equipment. From its inception the partnership prospered, but most of the profits were put back into the business.

By September, 1944, Norwood had become dissatisfied with the association, and on September 30th he told Judd that he wanted to get out of the partnership. Judd agreed that Norwood could leave the business. Thereafter, Norwood performed no services for the company. It is agreed that no financial adjustment was made at that time because the company was then in a weak financial condition, and, if Norwood had withdrawn his share, it would have ruined the company. Judd admitted that it was then agreed between the parties, and that he told Norwood that he would try to dispose ''of the business . . . and settle up . . . whatever he had coming to him, . . . settle up the affairs of the business . . . divide the assets . . . of the business . . . on a one-third and two-thirds basis . . . I believe that I assured him that we would settle up when and if conditions would enable us to''; I told him that ''I would make a settlement, I assured him l would make a settlement as soon as possible, to settle things up, to settle up the partnership, make a settlement . . . I told him we were in very poor shape at that time. That was my excuse for not making a settlement at that time . . . for not . . . paying him what he had for his share in the business . . . He wanted to get away. I wanted to settle with him when I could, but I didn't want to harm the business doing it . . . I wanted him to wait until I could get out of the difficulties we were in.''

In January, 1945, Judd paid Norwood $1,500 as part payment of his share of the partnership, and renewed his promise to settle up in full as soon as possible. Judd concedes that this payment did not discharge his obligation to Norwood, but no further payments were ever made.

On these facts the trial court found that plaintiff and defendant orally entered into a copartnership agreement, on June 4, 1942, for the purpose of conducting a general contracting business of sandblasting and painting, and thereafter accumulated property and equipment which they held as partnership property; that plaintiff and defendant continued to operate as partners until September 30, 1944; that ''the type of work performed by said copartnership required a contractor's license issued in the name of the copartnership''; that ''defendant was issued a Contractor's License in his

individual name in July, 1942, and defendant was issued a Contractor's License in the name of Fred T. Judd Company in April of 1943; that said licenses were issued to an individual and not to an association or to said copartnership and no contractor's license was ever issued to plaintiff or to said copartnership''; that it ''is true that the business conducted by said plaintiff and said defendant in the absence of a contractor's license issued to the copartnership rendered said copartnership business illegal and void and that said plaintiff is not entitled to an accounting or to any division of the profits of said copartnership''; that ''said plaintiff does not come into Court with clean hands and is not entitled to the aid or interposition of a Court of equity.''

The judgment based on these findings denying the plaintiff any relief, and from which this appeal is taken, deprives the plaintiff, who contributed a material portion of the assets to this partnership and whose efforts were partially responsible for the profits, from any participation at all in such assets or profits, and all of such assets and profits are retained by defendant because the latter, charged with the responsibility of securing a permit, improperly secured an individual permit when he should have secured a partnership permit. Such unjust enrichment of the defendant should not be permitted, unless compelling principles of law or equity require such a result. Fortunately, there is no legal or equitable impediment to doing justice in this case.

Before directly discussing the contentions of the parties, reference should be made to the pertinent sections of the Business and Professions Code. They are:

''§ 7025. 'Person' defined. 'Person' as used in this chapter includes an individual, a firm, copartnership . . . or other organization . . .''

''§ 7026. 'Contractor': Defined. . . . a contractor is any person, . . . who in any capacity other than as the employee of another with wages as the sole compensation, undertakes to or offers to undertake to or purports to have the capacity to undertake to or submits a bid to, or does himself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, railroad, excavation or other structure, project, development or improvement, or to do any part thereof, including the erection of scaffolding or other structures or works in connection therewith.''

"§ 7027. *Same: Includes subcontractors and excludes materialmen.* A contractor . . . includes subcontractor or specialty contractor . . ."

"§ 7028. *Engaging in business without license.* It is unlawful for any person to engage in the business or act in the capacity of a contractor within this State without having a license therefor, unless such person is particularly exempted from the provisions of this chapter."

"§ 7028.5. *Member, etc., of firm individually acting as contractor.* It is unlawful for any person who is or has been a member, officer, director or responsible managing officer of a licensed copartnership, corporation, firm, association or other organization to individually engage in the business or individually act in the capacity of a contractor within this State without having a license in good standing to so engage or act."

"§ 7030. *Acting without license or conspiring to violate chapter: Misdemeanor.* Any person who acts in the capacity of a contractor without a license, and any person who conspires with another person to violate any of the provisions of this chapter, is guilty of a misdemeanor."

"§ 7031. *Allegation and proof of license in action on contract.* No person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action in any court of this State for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging and proving that he was a duly licensed contractor at all times during the performance of such act or contract."

"§ 7045. *Sale or installation of things not part of structure.* This chapter does not apply to the sale or installation of any finished products, materials or articles of merchandise, which are not actually fabricated into and do not become a permanent fixed part of the structure."

"§ 7046. *Personal property work.* This chapter does not apply to any construction, alteration, improvement or repair of personal property."

"§ 7047. *Construction on Federal-owned sites.* This chapter does not apply to any construction, alteration, improvement or repair carried on within the limits and boundaries of any site or reservation, the title of which rests in the Federal Government."

"§ *7068.* . . . The board shall require an applicant to show such degree of experience, and such general knowledge of the building . . . laws of the State and of the rudimentary administrative principles of the contracting business as the board deems necessary for the safety and protection of the public.

". . . An applicant may qualify in regard to his experience and knowledge in the following ways: . . .

"(b) If a copartnership, . . . it may qualify by the appearance of the responsible managing officer or member of the personnel of such applicant firm."

"§ *7069.* . . . An applicant and each officer, director, partner, associate and responsible managing employee thereof shall possess good character. . . ."

"§ *7071.* . . . No license shall be issued to a . . . copartnership . . . if any responsible officer of such corporation, or other combination or organization, or any member of such copartnership does not meet the qualifications required of an applicant other than those qualifications relating to knowledge and experience."

The plaintiff contends that the evidence does not show that the contracting work performed by the partnership was not within the exceptions contained in section 7045, 7046 and 7047. He urges that this court should judicially notice that this partnership operated during the war period, and that there is no evidence that the jobs performed by it were not on federally owned property (§ 7047), or were not performed on personalty (§ 7046), or did not fall within section 7045. We are not impressed with these arguments. The work performed by this partnership falls within the definition of contracting contained in section 7026. Sections 7045, 7046 and 7047 provide that certain types of contractors are exempted from that section. One claiming an exemption from a general statute has the burden of proving that he comes within the exemption. This, plaintiff failed to do. Moreover, there is evidence that some of the work performed did not fall within section 7045; that it was performed on other than personal property (§ 7046), and that it was performed for companies owning their own plants and sites (§ 7047). The paucity of evidence on this point is explained by the fact that the issue as to the license requirement was not raised until after all the evidence had been presented. However this may be, it is quite clear that the findings that this partnership was engaged in the contracting business as defined by the Business and

Professions Code, and that it should have secured a partnership license, are amply supported by the evidence.

The basic question presented is whether, under the facts here disclosed, the failure to secure a partnership license precludes plaintiff from recovering any portion of the assets and profits because of the principle that, having engaged in an illegal enterprise, he is *in pari delicto* and has not come into equity with clean hands, and must therefore be denied all relief.

It should be noted that this is not a case where the parties engaged in a business prohibited by statute or public policy, or where a license would not have been issued had application been made. Although Norwood was not a citizen and was not a contractor, such facts would not have prevented the company from securing a partnership license as long as Judd was a qualified contractor. (Bus. & Prof. Code, §§ 7068, 7069 and 7071.)

The principle that participants to an illegal contract who are *in pari delicto* can secure no relief based on such contract, is an ancient and most salutary one. It is part of the general rule that he who comes into equity must come with clean hands. (See, generally, 2 Pomeroy's Equity Jurisprudence (5th ed.), §§ 397-404.) The rule in license cases is most frequently applied to those situations where a firm or person required to be licensed fails to secure a license and sues a third person for services rendered or material furnished. In such event the unlicensed firm or person cannot recover because to do so would be to defeat the very purpose of the licensing statute. The contractor's license law expressly so provides. (Bus. & Prof. Code, § 7031, *supra*; see, also, *Loving & Evans* v. *Blick*, 33 Cal.2d 603 [204 P.2d 23]; *Franklin* v. *Nat C. Goldstone Agency*, 33 Cal.2d 628 [204 P.2d 37].) But even this rule has its exceptions. Thus, in *Gatti* v. *Highland Park Builders, Inc.*, 27 Cal.2d 687 [166 P.2d 265], an action was brought by two partners against a third person to recover for carpenter work performed by them. The defense was that the partnership was unlicensed. The facts were that Gatti and Moore each held individual licenses as contractors. Gatti contracted individually with defendant to do the work involved. Later Gatti and Moore entered into a partnership. Defendant agreed that the partnership could complete the contract. No partnership license in the names of Gatti and Moore was ever secured. It was held that the

partners could recover even though the partnership was unlicensed. The court pointed out (p. 690) that the contractor's licensing law was passed for the safety and protection of the public, and that such a law should not be used as a "shield for the avoidance of a just obligation."

Another exception to the general rule is found in those cases holding that an unlicensed person is not precluded from recovering a commission if he had a license at the time the contract was performed and the cause of action arose, although the contract for the commission or services was executed when he was unlicensed. (*Fewel & Dawes, Inc.* v. *Pratt,* 17 Cal.2d 85 [109 P.2d 650]; *Houston* v. *Williams,* 53 Cal.App. 267 [200 P. 55]; *Radich* v. *Cernokus,* 65 Cal.App. 452 [224 P. 124]; *Brenneman* v. *Lane,* 87 Cal.App. 414 [262 P. 400].)

■ Where the rights of third parties are not involved, California has recognized another exception to the general rule in certain cases where the action is between the contracting parties. That exception is that equitable relief will not be denied a party to a partnership contract against his partner where the business engaged in is a lawful one and not against public policy, but the parties failed to secure a required license, and where the cause of action is not directly predicated on the partnership agreement, but is or can be predicated on a new promise arising out of the executed partnership agreement. In other words, equity can and will grant relief where the court is not required, in granting the relief, to lend its aid in enforcing a transaction illegal only because a permit that could have been secured was not secured. The leading case on this subject is *Denning* v. *Taber,* 70 Cal. App.2d 253 [160 P.2d 900] (hearing denied by the Supreme Court without a dissenting vote). The factual situation in that case was very similar to that involved in the instant one. There the plaintiff and defendant entered into a partnership agreement to operate a bar. They operated such an establishment for about 16 months, and then agreed to close the business. The defendant orally agreed at that time to equally divide the assets of the partnership then in his hands. This he refused to do and plaintiff brought this action for an accounting. The defendant's defense was that, under the law, partners operating a bar must secure individual licenses to operate. The defendant had secured a license in his name but failed to secure a license for plaintiff. Plaintiff testified that he had relied upon the defendant to secure the required licenses. The court allowed the plaintiff to maintain his action

for an accounting. The reasoning of the court is disclosed in the following quotation (p. 257):

"But we cannot escape the conclusion that the illegal conducting of the saloon business without a proper license for each individual partner would ordinarily require the court to refuse upon the ground of public policy to determine issues between the partners regarding the division of, or the title to the assets of the business. (*Wise* v. *Radis*, 74 Cal.App. 765 [242 P. 90].) But there is a well-recognized exception to that rule which appears to be founded on good morals and sound judgment. When a business, which has been illegally conducted for lack of license, as distinguished from an unlawful and forbidden enterprise, has been completely terminated and one of the parties subsequently expressly agrees to divide in a specified manner the assets in his possession, courts will entertain suits for accounting, in assumpsit, or based on an implied trust, to recover the property belonging to the claimant. [Cases cited.] The reason assigned for the application of the foregoing exception to the general rule is . . . that:

" 'When the illegal transaction has been consummated, when no court has been called upon to give aid to it, when the proceeds of the sale have been actually received, and received in that which the law recognizes as having had value, and when they have been carried to the credit of the plaintiffs, the case is different. The court is there not asked to enforce an illegal contract. The plaintiffs do not require the aid of any illegal transaction to establish their case. It is enough that the defendants have in hand a thing of value that belongs to them. Some of the authorities show that, though an illegal contract will not be executed, yet, when it has been executed by the parties themselves, and the illegal object of it has been accomplished, the money or thing which was the price of it may be a legal consideration between the parties for a promise, express or implied, and the court will not unravel the transaction to discover its origin.'

"If that distinction controls an executed agreement which was illegally designed by the parties, it should apply with greater justice and force to a division of assets expressly agreed upon by the parties after the termination of the business by mutual consent which was merely conducted without a license contrary to law. This is especially true when the plaintiff is not *in pari delicto,* or when he is at least much less culpable of wrongful conduct."

At page 260 the court stated: ''Conceding that the saloon business was conducted illegally because a partnership license was not procured in the names of both partners as required by law, we are satisfied that the plaintiff is nevertheless entitled to maintain this suit for an accounting of assets because it does not necessarily involve the legality of the partnership agreement to conduct the Diamond Bar saloon but depends upon the oral agreement to divide the property equally which was made by the parties after the voluntary termination of the business without the aid of court.''

■ Defendant seeks to distinguish this case on the ground that in the instant case the partnership was not fully terminated, and that the company has never discontinued operations. We do not think the Denning case can be distinguished on any such tenuous grounds. Norwood, by agreement, completely disassociated himself from the business after September, 1944. For all practical purposes the partnership was terminated at that time, and from then on Judd continued the business as sole owner. In the instant case, as in the Denning case, defendant secured the license and secured it in his own name. There was no legal obstacle to including plaintiff's name in the application, and a partnership license could have been secured, but this, defendant did not do. As in the Denning case, Judd expressly agreed to divide the assets and profits in his hands, after Norwood had terminated his relationship to the partnership.

It must be remembered that these licensing statutes are passed primarily for the protection and safety of the public. They are not passed for the benefit of a greedy partner who seeks to keep for himself all of the fruits of the partnership enterprise to the exclusion of another partner entitled to share therein. Where the illegal transaction has been terminated, public policy is not protected or served by denying one partner relief against the other.

The rule of the Denning case is also the rule adopted by the United States Supreme Court. Thus, in *Brooks* v. *Martin*, 2 Wall. (69 U.S.) 70, 81 [17 L.Ed. 732], that court quoted, with approval, the following language used by the English court in *Sharp* v. *Taylor*, 2 Phillips' Ch. 801: '' 'The answer to the objection appears to me to be this,—that the plaintiff does not ask to enforce any agreement adverse to the provisions of the act of Parliament. He is not seeking compensation and payment for an illegal voyage. That matter was disposed of when Taylor' (the defendant) 'received

the money; and plaintiff is now only seeking payment for his share of the realized profits. . . . As between these two, can this supposed evasion of the law be set up as a defence by one against the otherwise clear title of the other? Can one of two partners possess himself of the property of the firm, and be permitted to retain it, if he can show that, in realizing it, some provision or some act of Parliament has been violated or neglected? . . . The answer to this, as to the former case, will be, that the transaction alleged to be illegal is completed and closed, and will not be in any manner affected by what the court is asked to do between the parties. . . .' ''

This view was reaffirmed by the Supreme Court of the United States in *Planters' Bank* v. *Union Bank,* 16 Wall. (83 U.S.) 483, 499 [21 L.Ed. 473], which case was cited with approval in the Denning case. It is also the view adopted in other states. (See *Melton* v. *United Retail Merchants,* 24 Wn.2d 145 [163 P.2d 619], where cases from several states are collected and commented upon; see, also, cases collected and commented upon 2 Pomeroy's Equity Jurisprudence (5th ed.) § 402f, p. 134.)

It must be conceded that there are cases the other way. Many of them quote and rely upon the language used by Lord Mansfield in *Holman* v. *Johnson,* 1 Cowp. 341, where he denied relief to the plaintiff on the theory that: ''The objection that a contract is immoral or illegal as between plaintiff and defendant sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this: 'Ex dolo malo non oritur actio.' No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So, if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter would then have advantage of it; for, where both are equally in fault, 'potoir est conditio defenditis.' '' Some jurisdictions in this country follow this theory. (See *Teoli* v. *Nardolillo,* 23 R.I.

87 [49 A. 489, 492]; *Hoge* v. *George, Admr.,* 27 Wyo. 423 [200 P. 96, 18 A.L.R. 469].) The Restatement of Restitution takes no position on this problem, but notes the conflict (§ 140).

It must also be conceded that there is at least one California case that has followed the theory expressed by Lord Mansfield. That is the case of *Wise* v. *Radis,* 74 Cal.App. 765 [242 P. 90] (no hearing requested), which is strongly relied upon by defendant here. There can be little doubt but that the Wise case is a strong authority in support of defendant. There the plaintiff and defendant each had an individual broker's license. They orally agreed to work together on certain sales as equal partners. No partnership license was secured as required by statute. The plaintiff allowed his license to lapse. Thereafter, a sale was negotiated and the commission was paid to defendant who refused to split with plaintiff. The appellate court held that the plaintiff could not maintain an action against defendant for his share of the commission. In so holding, the court (p. 780) expressly refused to recognize as an exception to the general rule the doctrine that where the illegal purpose of the partnership has been accomplished an action will lie between partners, and referred to this so-called exception as "unsound." The court stated (p. 776): ". . . since respondent, in order to establish his case, necessarily must invoke the partnership contract, it follows that, if the issuance of a copartnership license was requisite, the court will not lend its aid to assist either party to the contract in an action against the other, notwithstanding the receipt by the latter of partnership profits, but will leave both parties where it finds them."

If this case is still the law of California, it would require an affirmance of the instant case. It was distinguished in the much later Denning case in which a hearing was denied. A fair reading of the two cases demonstrates that they are diametrically opposed and that, in legal effect, the Denning case overruled the Wise case. It is worth noting that, although the Wise case has, on occasion, been cited in later cases, in most such cases it was cited only to distinguish it. (See *Gatti* v. *Highland Park Builders, Inc.,* 27 Cal.2d 687, 689 [166 P.2d 265]; *Denning* v. *Taber,* 70 Cal.App.2d 253, 257 [160 P.2d 900]; *Wagner* v. *Worrell,* 76 Cal.App.2d 172, 180 [172 P.2d 751].)

The reasoning of the Denning case is most convincing. The rule that the courts will not lend their aid to the

enforcement of an illegal agreement or one against public policy is fundamentally sound. The rule was conceived for the purposes of protecting the public and the courts from imposition. It is a rule predicated upon sound public policy. But the courts should not be so enamored with the Latin phrase *"in pari delicto"* that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied. That is the theory of the Denning case, and of the other cases above cited, and we think it is the correct and more enlightened rule.

One other case, not cited by the parties but dealing with the same subject matter, should be cited—the case of *Hooper* v. *Barranti*, 81 Cal.App.2d 570 [184 P.2d 688]. Hooper operated a liquor tavern under a license issued in his own name. He made an agreement with Barranti that they become equal partners in the operation of the business, and it was agreed that Barranti was to pay Hooper $1,500 at the rate of $100 a month for this one-half interest in the business. It was also agreed that the liquor license should remain in Hooper's name until the payments were completed, although the business was to be operated by the partnership. It was further agreed that the active conduct of the business was to be undertaken by Barranti. About a year later, Hooper rescinded on the ground that Barranti was not an American citizen, and shortly thereafter he forcibly ejected Barranti from the premises and excluded him from the business. Barranti assigned his interest in the business to his brother, and, in an action by Hooper to declare the dissolution of the business and secure an accounting, the brother filed a complaint in intervention. This court held that Barranti could assert no claim or right to receive any of the assets of the partnership, and affirmed the trial court in its refusal to determine ownership of the license issued in Hooper's name. It was there stated (p. 579): "The partner Barranti could therefore assert no claim or right to receive any of the assets of the partnership except through

the partnership and an accounting of its affairs. His ownership of those assets being that of a tenant in partnership it cannot be established without the aid of the partnership agreement. That agreement being illegal from its inception, he is without that aid. This must apply with equal force to all of the assets, including whatever interest the partnership may have had in the license standing in the name of Hooper.''

This case presents a sound application of the general rule. It is clearly distinguishable from the present case. In the Hooper case the very agreement itself provided for the conducting of the bar business for 15 months without a proper license. The agreement was, by its terms, in direct violation of the statute, against public policy and void on its face. In the instant case, the agreement was not *per se* contrary to any statute. Had Judd secured a partnership license, which could have been secured, there would have been no violation of law at all. The illegality involved was the failure to comply with a technical formality—it was not founded on the agreement itself. In the second place, in the Hooper case, it was impossible for the parties to have entered into a lawful agreement of partnership because Barranti was a noncitizen, and aliens cannot secure liquor licenses as a partner or otherwise. No citizenship requirement (see Bus. & Prof. Code, §§ 7068, 7069 and 7071, *supra*) exists in connection with the issuance of contractors' licenses. In the third place, Barranti was active in the actual conduct of the business—he operated the bar and sold liquor, which was precisely what the Legislature, in the interest of protecting the public, did not want an alien to do. Norwood, on the other hand, acted primarily as a bookkeeper, and did not directly perform contracting services. Thus, the public welfare and safety were not threatened. In the fourth place, the case may be distinguished on the same ground used by the author of the Denning opinion to distinguish the Wise case, namely, that in the instant case the partnership was terminated and thereafter Judd promised to divide the assets and profits in his hands in a specified manner, while in the Hooper case no such subsequent promise was made.

The judgment appealed from is reversed.

Ward, J., and Bray, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 29, 1949. Edmonds, J., voted for a hearing.