Opinion
 

 HUFFMAN, Acting P. J.
 

 In this wrongful discharge case, Jeffrey Jacobs alleges Universal Development Corporation (UDC)
 
 [1]
 
 and managerial employees Robert Cross and Herbert Palmtag contravened public policy by firing him after he refused to participate in a rebate program which violated
 
 *696
 
 federal lending laws. Jacobs appeals from the granting of defense summary judgment motions in which the court found Cross and Palmtag had no individual liability for the tort, and that Jacobs—through his earlier participation in and profit from UDC’s illegal rebate program—was in pari delicto with UDC and thus precluded from maintaining this action. We conclude the trial court properly granted Cross’s and Palmtag’s motions, but erred in granting UDC’s motion as the in pari delicto doctrine is inapplicable under the circumstances of this case.
 

 Factual and Procedural Background
 

 In June 1990 UDC hired Jacobs as sales and marketing director for four San Diego residential developments. Jacobs received a salary and $125 for every home closing escrow. His duties included reviewing and initialing purchase offers before they were given to his superiors for acceptance or rejection. Initially, Jacobs’s immediate supervisor was San Diego division manager James Omsberg; Cross replaced Omsberg in November 1991.
 

 Shortly after Jacobs’s employment began, he learned that in some federally financed transactions, UDC approved purchase offers including rebates of several thousand dollars after close of escrow. Jacobs believed the “out of escrow” rebates were not revealed to federal lenders, and therefore violated federal lending laws.
 
 [2]
 
 He protested the practice to Omsberg twice, and at some point in 1991 UDC discontinued the out of escrow rebates. Cross, however, resumed the rebate program shortly after replacing Omsberg. Jacobs and at least one other UDC employee protested to Cross numerous times; Jacobs took his concerns no further because he feared being fired. Believing the out of escrow rebates to be illegal, Jacobs nonetheless initialed and forwarded to his superiors 12 purchase offers including them. UDC accepted the offers, and Jacobs ultimately received the standard $125 commissions, or a total of $1,500.
 

 In early 1992 Cross and Palmtag, UDC’s assistant vice-president and regional manager, told Jacobs that in the future UDC expected Jacobs to be the San Diego division’s real estate broker of record. In May 1992 Cross approved a purchase offer including an out of escrow rebate, after which Jacobs told Cross he believed the rebate was illegal, and “when [Jacobs] became broker of record he would not participate in such a transaction and would not use his broker’s license to facilitate transactions of this type.” Later the same day, Cross fired Jacobs.
 

 Jacobs sued UDC, Cross and Palmtag for wrongfully terminating him for refusing to violate section 1014 of title 18 of the United States Code, which
 
 *697
 
 provides: “Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of [lenders] upon any application . . . commitment, or loan . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.” Additionally, Jacobs alleged UDC’s rebate program violated other federal statutes and regulations of the Department of Housing and Urban Development requiring all disbursements from federal loans to be revealed.
 

 UDC brought a motion for summary judgment based on its affirmative defense that Jacobs, through his past approval of and benefit from the allegedly illegal transactions, was in pari delicto with UDC and thus precluded from using judicial process for redress.
 
 [3]
 
 After a hearing, the trial court granted the motion, finding Jacobs and UDC were in pari delicto. The trial court also granted Cross’s and Palmtag’s motions for summary judgment on the basis that only an employer, and not individual employees, may be liable for tortious discharge. On appeal, Jacobs argues he raised triable issues of material fact regarding all motions.
 

 Discussion
 

 I
 

 Standard of Review
 

 Summary judgment is proper only where there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) “On appeal, this court exercises its independent judgment in determining whether there are no triable issues of material fact and the moving party thus is entitled to judgment as a matter of law.”
 
 (Sanchez
 
 v.
 
 Swinerton & Walberg Co.
 
 (1996) 47 Cal.App.4th 1461, 1466 [55 Cal.Rptr.2d 415].)
 

 “Inasmuch as summary judgment is a drastic procedure and should be used with caution [citation], the moving party’s papers are strictly construed, while the opposing party’s papers are liberally construed [citations]. [^D To secure summary judgment, a moving defendant may prove an affirmative defense, disprove at least one essential element of the plaintiff’s cause of action [citations] or show that an element of the cause of action cannot be established [citation], [Citation.] The defendant ‘must show that under no possible hypothesis within the reasonable purview of the allegations of the complaint is there a material question of fact which requires
 
 *698
 
 examination by trial.’ [Citation.] HD The moving defendant bears the burden of proving the absence of any triable issue of material fact, even though the burden of proof as to a particular issue may be on the plaintiff at trial. [Citation.] . . . Once the moving party has met its burden, the opposing party bears the burden of presenting evidence that there is a triable issue of fact as to any essential element of a cause of action. [Citation.]”
 
 (Sanchez
 
 v.
 
 Swinerton & Walberg Co., supra,
 
 47 Cal.App.4th at p. 1465.) “All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment. [Citation.]”
 
 (Barber
 
 v.
 
 Marina Sailing, Inc.
 
 (1995) 36 Cal.App.4th 558, 562 [42 Cal.Rptr.2d 697].)
 

 II
 

 UDC’s Motion
 

 The propriety of the trial court’s ruling hinges on the juxtaposition of tortious discharge law with the in pari delicto doctrine. As will be seen, at the heart of both is the public policy of deterring unlawful conduct.
 

 A.
 
 Tortious Discharge in Violation of Public Policy
 

 Labor Code section 2922 provides in relevant part, “[a]n employment, having no specified term, may be terminated at the will of either party on notice to the other. . . .” “This presumption may be superseded by a contract, express or implied, limiting the employer’s right to discharge the employee. [Citations.] Absent any contract, however, the employment is ‘at will,’ and the employee can be fired with or without good cause. But the employer’s right to discharge an ‘at will’ employee is still subject to limits imposed by public policy, since otherwise the threat of discharge could be used to coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public weal.”
 
 (Foley
 
 v.
 
 Interactive Data Corp.
 
 (1988) 47 Cal.3d 654, 665 [254 Cal.Rptr. 211, 765 P.2d 373], fns. omitted.)
 

 “Past decisions recognizing a tort action for discharge in violation of public policy seek to protect the public, by protecting the employee who refuses to commit a crime [citations], who reports criminal activity to proper authorities [citations], or who discloses other illegal, unethical, or unsafe practices [citation].”
 
 (Foley
 
 v.
 
 Interactive Data Corp., supra,
 
 47 Cal.3d at p. 670.) For instance, in
 
 Petermann
 
 v.
 
 International Brotherhood of Teamsters
 
 (1959) 174 Cal.App.2d 184, 188-189 [344 P.2d 25], the court declared, “It would be obnoxious to the interests of the state and contrary to public policy and sound morality to allow an employer to discharge any employee,
 
 *699
 
 whether the employment be for a designated or unspecified duration, on the ground that the employee declined to commit perjury, an act specifically enjoined by statute.”
 

 In
 
 Tameny
 
 v.
 
 Atlantic Richfield Co.
 
 (1980) 27 Cal.3d 167, 178 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 1107], the court held, “. . . an employer’s authority over its employees does not include the right to demand that the employee commit a criminal act to further its interests, and an employer may not coerce compliance with such unlawful directions by discharging an employee who refuses to follow such an order. An employer engaging in such conduct violates a basic duty imposed by law upon all employers, and thus an employee who has suffered damages as a result of such discharge may maintain a tort action for wrongful discharge against the employer.”
 

 B.
 
 In Pari Delicto Doctrine
 

 In pari delicto means, “[i]n equal fault; equally culpable or criminal; in a case of equal fault or guilt.” (Black’s Law Dict. (6th ed. 1990) p. 791, col. 1.) According to Witkin,
 
 “[h]e who comes into equity must come with clean hands. A
 
 court will neither aid in the commission of a fraud by enforcing a contract, nor relieve one of two parties to a fraud from its consequences, where both are
 
 in pari
 
 delicto.” (11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 8, p. 684, original italics.) The doctrine “ ‘closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.’ ”
 
 (Id.
 
 at pp. 684-685.) “In California, the doctrine of unclean hands may apply to legal as well as equitable claims [citation] and to both tort and contract remedies. [Citations.]” (Ca
 
 mp
 
 v.
 
 Jeffer, Mangels, Butler & Marmaro
 
 (1995) 35 Cal.App.4th 620, 638 [41 Cal.Rptr.2d 329].)
 

 In
 
 Norwood
 
 v.
 
 Judd
 
 (1949) 93 Cal.App.2d 276, 288-289 [209 P.2d 24], the court discussed the doctrine’s applicability in the following oft-quoted passage: “The rule that the courts will not lend their aid to the enforcement of an illegal agreement or one against public policy is fundamentally sound. The rule was conceived for the purposes of protecting the public and the courts from imposition. It is a rule predicated upon sound public policy. But courts should not be so enamored with the Latin phrase
 
 ‘in pari delicto’
 
 that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction
 
 *700
 
 has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.”
 

 Citing
 
 Norwood
 
 approvingly, our high court held in
 
 Tri-Q, Inc.
 
 v.
 
 Sta-Hi Corp.
 
 (1965) 63 Cal.2d 199, 218 [45 Cal.Rptr. 878, 404 P.2d 486]: “There is no doubt that the general rule requires the courts to withhold relief under the terms of an illegal contract or agreement which is violative of public policy. [Citations.] It is also true that . . . ‘when the evidence shows that ... [a party] in substance seeks to enforce an illegal contract or recover compensation for an illegal act, the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids.’ [Citation.] These rules are intended to prevent the guilty party from reaping the benefit of his wrongful conduct, or to protect the public from the future consequences of an illegal contract. They do not necessarily apply to both parties to the agreement unless both are truly
 
 in pari
 
 delicto.”
 

 The in pari delicto doctrine may preclude an employee from enforcing an illegal contract entered into with the employer, particularly where the employee did not allege he was unduly influenced by his employer. (See, e.g.,
 
 Severance
 
 v.
 
 Knight-Counihan Co.
 
 (1947) 29 Cal.2d 561, 567-570 [177 P.2d 4, 172 A.L.R. 1107] [purpose of employment contract was to defraud employer’s creditors].)
 

 With the foregoing in mind, we determine whether UDC met its statutory burden of proving its in pari delicto affirmative defense entitled it to judgment as a matter of law.
 

 C.
 
 UDC’s Evidence
 

 In its memorandum of points and authorities, UDC argued this action is precluded because Jacobs’s claims for relief rested on his participation in and profit from UDC’s illegal rebate program. In support, UDC relied upon Palmtag’s declaration, in which he stated: “As the Director of Sales & Marketing for the San Diego Division of UDC, Jacobs was responsible for sales of UDC homes in San Diego County. It is my understanding that Jacobs was required to review all sales transactions and documents, to initially approve the sales transactions as presented, and to submit the packet of sales documents to the Division Manager for acceptance by UDC. He initialed many of the sales documents and homeowner payment check requests involving the sale of UDC homes which I am informed that he now alleges were ‘fraudulent.’ ’’
 

 
 *701
 
 UDC also submitted Jacobs’s deposition testimony that his sales duties included, “hiring, training, replacement of sales agents, recommending pricing, monitoring the processing of the sale”; he had to initial all purchase offers before UDC’s consideration; he initialed some purchase offers including rebates he believed were illegal, but he “initialed that [he] had seen [the offers], not that [he] approved them”; he received $125 on each of the transactions; he expressed concerns that the rebates “could have been illegal” to his supervisor, Omsberg, at least twice and probably three times, the first time within days of being hired; he reported his concerns regarding the rebates to Cross, who replaced Omsberg, a dozen times, to another employee a dozen times, and to certain lenders; he did not report his concerns to Palmtag, the Department of Real Estate, Federal Home Loan Bank Board, Department of Corporations, the district attorney or any law enforcement or federal agency, “because Rob [Cross] would have fired [him].”
 

 Based on the evidence, the trial court found: “Plaintiff cannot prove his case without showing that he broke the law. Plaintiff became aware of the ‘outside of escrow’ rebates within days of his hiring in June, 1990. [Citation.] He surmised that these transactions violated federal law. [Citation.] Plaintiff had to review and personally approve the sales transaction. He knew the transaction involved allegedly illegal practices when he initialed them. [Citation.] Plaintiff acquiesced in the practice until UDC wanted to reinstate his broker’s license to use it for the sales transactions with him as broker of record. When he confronted Mr. Cross and indicated that he would not allow that use of his license, he was fired. Plaintiff is in pari delicto with the Defendants and cannot recover against them.”
 

 We conclude the court’s findings were in error, and that UDC failed to meet its statutory burden of proving its entitlement to judgment as a matter of law. UDC’s evidence shows only that Jacobs—while consistently protesting to his immediate supervisors—acquiesced in UDC’s illegal rebate program because he presciently feared being fired if he did not. Jacobs is not suing to enforce the terms of an illegal agreement, and he need not rely on any culpability of his own to prove entitlement to tortious discharge damages. As the court explained in
 
 Foley
 
 v.
 
 Interactive Data Corp., supra, 47
 
 Cal.3d at page 667, footnote 7, with regard to public policy concerns, there is a critical difference between an employee’s breach of contract action and a tortious discharge action: “If an employer and employee enter into a contract in which the employee agrees to perform an illegal act, and either party breaches, the courts will not enforce the contract. In the
 
 Tameny
 
 situation [tortious discharge in violation of public policy], however, typically the employer requires the employee to perform an act in contravention of public policy and then terminates the employee for failure to do so, or
 
 *702
 
 penalizes the employee for acting in accordance with law. When such a termination occurs, the nature of the employee’s relationship with the employer, whether at will or contractual, is essentially irrelevant.
 
 What is vindicated through the cause of action is not the terms or promises arising out of the particular employment relationship involved, but rather the public interest in not permitting employers to impose as a condition of employment a requirement that an employee act in a manner contrary to fundamental public policy."
 
 (Italics added.)
 

 We have found no California case discussing the in pari delicto doctrine in the context of a tortious discharge case; however, it is apparent from
 
 Foley
 
 that vindication of the fundamental public interest is not automatically foreclosed by the employee’s past acquiescence in his employer’s illegal conduct. This is further illustrated by constructive discharge law, which expressly protects an employee who quits after being subjected to a continuous pattern of adverse working conditions.
 
 [4]
 
 As shown by
 
 Smith
 
 v.
 
 Brown-Forman Distillers Corp.
 
 (1987) 196 Cal.App.3d 503 [241 Cal.Rptr. 916], intolerable conditions may arise when an employee has been required to violate the law at the employer’s direction. There, the employee knowingly violated federal and state liquor laws over a several month period. After protesting numerous times to no avail, the employee quit because he feared arrest. Although he participated in the criminality himself, the employee successfully sued the employer for tortious discharge. The same protection must be afforded the employee who is fired outright after refusing to further participate in the employer’s criminality.
 

 Additionally, under the test of
 
 Norwood
 
 v.
 
 Judd, supra,
 
 93 Cal.App.2d at pages 288-289, it is clear that Jacobs was not in pari delicto with UDC. Any illegal conduct of Jacobs is completed, not executory, and this action is not founded on any illegal or immoral act of Jacobs. While Jacobs’s conduct cannot be condoned, it was motivated by the realistic fear of losing his job, and thus his initialing of purchase offers including illegal rebates and accepting the standard $125 commissions on such sales, did not involve
 
 *703
 
 reprehensible moral conduct. Certainly, there was no moral turpitude involved in Jacobs's ultimate refusal to participate in UDC’s rebate program, and to the contrary an employee initially acquiescing in his employer’s criminality should be encouraged to cease such activity and not left without recourse when he is consequently fired. UDC was guilty of the greatest moral fault as it instigated the illegal rebate program, proceeded with it over Jacobs’s protests, and then abruptly fired him after he refused further participation. And, finally, application of the doctrine would unjustly enrich UDC and violate fundamental public policy by allowing it to condition continued employment on criminal conduct.
 

 While it is impossible to anticipate every situation, and thus there may be egregious circumstances under which the in pari delicto doctrine would preclude tortious discharge recovery, UDC presented no such evidence. Because UDC did not meet its burden of proof, Jacobs was not required to raise triable issues of material fact.
 

 Ill
 

 Cross’s and Palmtag’s Motions
 

 Cross and Palmtag brought separate motions for summary judgment, arguing that only the employer may be liable for terminating an employee in violation of public policy, and that they did not personally benefit from the rebate program and therefore had no reason to terminate Jacobs for his refusal to participate in it. In support, they relied upon UDC’s response to a demand for production stating they, “received no bonuses ‘based upon the number of homes sold by [UDC] or based upon the gross or net sales price of such homes’ for the aforementioned period.” They also relied upon Jacobs’s deposition testimony that he did not think Palmtag disliked him, and he “couldn’t tell if [Cross] didn’t like me or he didn’t like anyone. He was just rude. He was rude to everybody.” Additionally, Palmtag produced evidence he was “two steps” removed from Jacobs’s position with UDC and had only supervisory authority over Cross, Jacobs never complained to him about the illegal rebates, it was not his decision to fire Jacobs and he was not present when Cross fired Jacobs.
 

 In opposition, Jacobs argued that Cross and Palmtag had personal motive to fire him. In support, he relied upon Cross’s deposition testimony that if he met UDC’s budget, the nature of which was unspecified, he could receive a bonus of up to 50 percent of his base salary, and that he might also qualify for a merit increase, Palmtag was located in UDC’s San Diego offices right next to Cross’s office and Palmtag’s responsibilities included overseeing
 
 *704
 
 activities of the San Diego division, Cross conferred with Palmtag more than once before firing Jacobs, and when Jacob asked for a letter from UDC regarding why he was fired, Cross advised he would “speak to Herb [Palmtag], but wouldn’t promise anything.” Additionally, Jacobs relied upon Palmtag’s deposition testimony that Cross consulted him before firing Jacobs.
 

 We conclude the trial court properly granted the motions. Only an employer can be liable for tortious discharge, and fellow employees cannot be held accountable for tortious discharge on a conspiracy theory.
 
 (Weinbaum
 
 v.
 
 Goldfarb, Whitman & Cohen
 
 (1996) 46 Cal.App.4th 1310, 1315 [54 Cal.Rptr.2d 462];
 
 Gruenberg
 
 v.
 
 Aetna Ins. Co.
 
 (1973) 9 Cal.3d 566, 576 [108 CaLRptr. 480, 510 P.2d 1032].) It was undisputed that UDC was Jacobs’s employer, and the evidence Jacobs produced indicated Cross and Palmtag acted only in their official capacities. There was no triable issue of material fact.
 

 Disposition
 

 The judgment in favor of UDC, UDC Corporation, UDC Homes, Inc., and UDC Homes Limited Partnership is reversed and the matter is remanded for further proceedings consistent with the opinions expressed herein. The judgments in favor of Cross and Palmtag are affirmed. UDC to pay Jacobs’s costs on appeal; Jacobs to pay Cross’s and Palmtag’s costs on appeal.
 

 Nares, J., and Jones, J.,
 
 *
 
 concurred.
 

 [1]
 

 UDC includes defendants UDC Corporation, UDC Homes, Inc., and UDC Homes Limited Partnership.
 

 [2]
 

 The rebates resulted in federal lenders unknowingly loaning a greater percentage of the home’s value than the legal limit of 80 percent.
 

 [3]
 

 Cross and Palmtag were also moving parties; however, for convenience, we refer to UDC only with regard to this motion.
 

 [4]
 

 ‘Constructive discharge occurs when the employer’s conduct effectively forces an employee to resign.”
 
 (Turner
 
 v.
 
 Anheuser-Busch, Inc.
 
 (1994) 7 Cal.4th 1238, 1244 [32 Cal.Rptr.2d 223, 876 P.2d 1022].) “In order to amount to a constructive discharge, adverse working conditions must be unusually ‘aggravated’ or amount to a ‘continuous pattern’ before the situation will be deemed intolerable. In general, ‘[s]ingle, trivial, or isolated acts of [misconduct] are insufficient’ to support a constructive discharge claim. [Citation.]”
 
 {Id.
 
 at p. 1247, fn. omitted.) However, “[i]n some circumstances, a single intolerable incident, such as a crime of violence against an employee by an employer, or an employer’s ultimatum that an employee commit a crime, may constitute a constructive discharge. Such misconduct potentially could be found ‘aggravated.’ ”
 
 (Id.
 
 at p. 1247, fn. 3.) As with an actual discharge, a “constructive discharge in violation of fundamental public policy gives rise to a tort action in favor of the terminated employee. [Citations.]”
 
 (Id.
 
 at p. 1252.)
 

 *
 

 Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.