[No. B116366. Second Dist., Div. Two. July 16, 1998.]

CROSSTALK PRODUCTIONS, INC., et al., Plaintiffs and Appellants, v. STEVEN JACOBSON, Defendant and Respondent.

COUNSEL

Fox & Spillane, Gerard P. Fox, Cynthia A. Vroom and Anne E. Kearns for Plaintiffs and Appellants.

Heller & Edwards and Lawrence E. Heller for Defendant and Respondent.

## OPINION

**ZEBROWSKI, J.**—This case concerns the sustaining of a demurrer without leave to amend on grounds of unclean hands. Plaintiffs are CrossTalk Productions, Inc. (CrossTalk), and Jeffrey Keith and Steven Cross (the individual plaintiffs).[1] Defendant is Steven Jacobson (defendant). CBS Incorporated (CBS) was also a defendant, but is not a party to this appeal. The trial court sustained the demurrers of both defendant Jacobson and former defendant CBS without leave to amend, and entered a judgment of dismissal. Plaintiffs appeal only the dismissal as to defendant Jacobson.

## I. STANDARD OF REVIEW AND SUMMARY OF DISPOSITION.

A demurrer is treated as admitting all material facts properly pleaded, but not " 'contentions, deductions or conclusions of fact or law.' " (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) ". . . we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.]" (*Ibid.*) The complaint must be liberally construed with a view to substantial justice between the parties. (Code Civ. Proc., § 452.)

Here, the demurrer was based upon an affirmative defense (unclean hands). In such a case, the affirmative defense must clearly appear on the face of the complaint in order to support a demurrer. A demurrer based on an affirmative defense cannot properly be sustained where the action *might* be barred by the defense, but is not *necessarily* barred. (See, e.g., *Marshall* v. *Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403 [44 Cal.Rptr.2d 339] [statute of limitations defense].) Nor is a demurrer the appropriate procedure for determining the truth of disputed facts or what inferences should be drawn where competing inferences are possible. (*Ramsden* v. *Western Union* (1977) 71 Cal.App.3d 873, 879 [138 Cal.Rptr. 426].)

The complaint here did contain a factual ambiguity. If this ambiguity is construed one way, the ruling and dismissal by the trial court would be correct. Construed the other way, however, the ruling and dismissal by the trial court were clearly incorrect. The complaint otherwise contained no fatal

---

[1] All three plaintiffs are collectively referred to as "plaintiffs" where appropriate in the context involved.

defects. Since the complaint could easily have been amended to cure the ambiguity and to state a claim on which relief could be granted, the dismissal as to defendant Jacobson must be reversed.

II. FACTUAL AND PROCEDURAL BACKGROUND.

A. *Allegations of the complaint.*

The following facts, alleged in the complaint, must be accepted as true. The individual plaintiffs are the founders of plaintiff CrossTalk. Prior to, and for a period after, the incorporation of CrossTalk, the individual plaintiffs were employed by CBS Television Network.[2] Defendant Jacobson was at that time CBS's "Vice President, Advertising and Promotion (West Coast)." While employed at CBS, the individual plaintiffs reported directly to defendant Jacobson, who was their "boss" and had the ability to terminate their employment.

In late March of 1996, the individual plaintiffs approached defendant with the idea of forming an "outside" company to contract with CBS to supply video promotional spots. Defendant's responsibilities at CBS included selecting outside vendors, "overseeing" vendor contracts, and approving contract payments to vendors. Defendant would select the vendor, negotiate the terms of the contract, and approve the final contract. Even if a vendor contract exceeded defendant's "final authority" dollar level (and the signature of defendant's superior was hence required), defendant decided which vendors to select and defendant's superior "routinely approved" his decision. The individual plaintiffs asked defendant if they might be able to negotiate such a contract with CBS. Defendant's response was affirmative.

On or about April 25, 1996, the individual plaintiffs met with defendant and his superior to make a formal request "to be considered for an exclusive contract with CBS for the production of video promotional spots." Defendant's superior approved the request and "directed [defendant] to prepare the contract." Defendant and his superior asked the individual plaintiffs to remain at CBS until replacements could be hired. "At or about this point" the individual plaintiffs "let it be known to management" they would be leaving CBS to form CrossTalk.

The next day, defendant told plaintiff Keith that he wanted CrossTalk to "help him out" by paying him $500 a month, because he had done the individual plaintiffs a "favor." By this time, defendant knew that the individual plaintiffs had notified management that they were leaving and "had

---

[2] The CBS Television Network is a division of former defendant CBS.

staked their entire future on CrossTalk's deal with CBS." In considering defendant's demand, the individual plaintiffs knew that defendant had the ability to "kill" the contract CrossTalk was negotiating with CBS, and the power to terminate the contract once the individual plaintiffs were "out on their own." Defendant was also still the individual plaintiffs' "boss," and had the power to terminate their employment before they could start up CrossTalk.

Defendant's demand "shocked and dismayed" plaintiff Keith. Although he did not believe he and plaintiff Cross owed defendant (or CBS) anything other than their continued hard work, he told defendant that he would speak with plaintiff Cross. The individual plaintiffs then attempted to "rationalize" defendant's demands as a form of "help" to defendant and his department. The individual plaintiffs believed defendant "stood in a position of power and control" over them, and had their economic future "in his hands." They were intimidated by defendant's status at CBS and his power over the contract and all potential CrossTalk projects. CBS had not yet provided the "promised contract," and the individual plaintiffs feared they would lose both the contract and their jobs if they refused, or told anyone of, defendant's demand.

Plaintiff Keith was "greatly distressed, and felt as though a gun were being put to his head." Plaintiff Cross was also "very distressed." Both individual plaintiffs "believed, to their great distress, that they had no reasonable alternative under these circumstances but to accede to [defendant's] demand in order to *secure* CrossTalk's contract with CBS." (Italics added). Accordingly, plaintiff Keith returned to defendant's office and "reluctantly" agreed to pay. (The use of the term "secure" in the complaint apparently figured prominently in the ruling of the trial court below.)

The individual plaintiffs then incorporated CrossTalk. The CrossTalk/CBS contract, although dated "[a]s of May 15, 1996," was not actually executed (by defendant's superior and the individual plaintiffs) until July, with performance to begin on August 1. Under the agreement, CrossTalk would work exclusively for CBS for two years, in exchange for a guaranteed minimum number of projects.

The individual plaintiffs were unable to leave CBS prior to the August 1 start date. Plaintiff Keith therefore asked defendant if the $500 payments could begin the following month. Defendant agreed, but plaintiff Keith's "perception" was that defendant was expecting a payment soon "or the contract would be in jeopardy." The individual plaintiffs believed this was defendant's means of doing business, and the "price of admission being

charged by the person CBS empowered to preside over outside vendors." The individual plaintiffs still feared that the contract "on which they had staked their entire livelihood after leaving their jobs at CBS," would be imperiled if they did not make the payments demanded by defendant. Plaintiff Keith therefore delivered the first $500 to defendant on September 4, 1996, "under duress and believing that they had no other choice." He "tried to summon the strength to confront [defendant] . . . but the reality of defendant's position of power and authority, and the oppressive nature of his office, caused [plaintiff Keith] to fold under defendant's control and to accede to his demands."

Although plaintiff Keith delivered additional $500 payments to defendant in October and November 1996, the individual plaintiffs heard through a separate source that defendant wanted to cancel the contract. They consequently became even more fearful of the consequences of failing to pay. In December, when plaintiff Keith called to discuss billing on a project for which CrossTalk sought additional compensation, defendant said he wanted his payments increased to $1,000. Plaintiff Keith explained that CrossTalk could not afford that sum. Defendant appeared to become angry and stated that nonpayment would be "unacceptable."

After being advised that CrossTalk could not pay his increased demands, defendant began to fail to respond to plaintiff Keith's work-related communications, which made CrossTalk's performance under the contract difficult. On December 20, plaintiff Keith delivered to defendant $300 in cash and $200 in gift certificates he hoped would "pass" as the fourth payment. Defendant then claimed there were a number of "problems" with CrossTalk's projects. Although other CBS representatives had voiced satisfaction with CrossTalk's work, plaintiff Cross learned that defendant had been overheard suggesting that CrossTalk "would not be with CBS much longer." On January 16, 1997, the individual plaintiffs met with defendant and were given a letter detailing alleged "problems" with CrossTalk's work which had to be resolved to avoid cancellation of the contract.

The individual plaintiffs believed they were being "set up" and that the identified "problems" were "merely props for defendant's staged threat." On January 17, believing that defendant was about to terminate the contract, but unable to afford the $1,000 payments, the individual plaintiffs told CBS about defendant's demands, "along with his threat to cancel the contract after CrossTalk indicated it could not pay the increased amount."

CBS then terminated defendant (giving him a substantial "settlement" payment) in March of 1997. By letter dated May 15, 1997, CBS stated it was

terminating CrossTalk's contract "on the basis of the admitted wrongdoing of Jeffrey Keith and Steve Cross."

B. *Plaintiffs' theories and defendant's demurrer.*

Plaintiffs' complaint advanced three theories against defendant. The first, entitled "Economic Duress," alleges that defendant "wrongfully employed economic duress in demanding and receiving payments . . . ." The individual plaintiffs also asserted claims for intentional and negligent infliction of emotional distress. The complaint alleges that defendant abused his authority and power "with the recognition and desire" that such acts would result in severe emotional distress, or in the alternative, that defendant, as an officer of CBS, "owed a duty of due care" in dealing with plaintiffs, which he breached, resulting in damage to reputation and career development. Defendant demurred to all three causes of action for failure to state a claim upon which relief could be granted, arguing each claim was barred by the affirmative defense of "unclean hands."[3]

The trial court sustained the demurrers without leave to amend, on the theory that the allegations in the complaint established as a matter of law that the individual plaintiffs had committed "Commercial Bribery" as defined in Penal Code section 641.3, and that such an offense would necessarily establish a defense of unclean hands. Judgment of dismissal was entered and this appeal followed.

III. DISCUSSION.

A. *The complaint's use of the word "secure" cannot support the demurrer.*

The facts alleged, liberally construed with a view to doing substantial justice between the parties (Code Civ. Proc., § 452), do not necessarily establish a defense of unclean hands as a matter of law. This case presents no exception to the general rule that application of the doctrine of unclean hands is a question of fact. (*Insurance Co. of North America* v. *Liberty Mutual Ins. Co.* (1982) 128 Cal.App.3d 297, 306 [180 Cal.Rptr. 244]; *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 726-727 [39 Cal.Rptr. 64].) An examination of the facts alleged here leaves ample room for a verdict in favor of plaintiffs.

The complaint alleges that plaintiffs believed "that they had no reasonable alternative under these circumstances but to accede to [defendant's] demand

---

[3]Defendant separately demurred on the ground that "economic duress" is merely a "defense," which cannot be asserted as a cause of action. The record does not reflect a ruling on this ground.

in order to *secure* CrossTalk's contract with CBS." (Italics added.) The trial court apparently interpreted the word "secure" in the sense of "obtain, procure, get, acquire or gain." "Secure," however, can also mean "protect, guard or safeguard." Applying the meaning first stated above, the complaint could be read to mean that the individual plaintiffs paid defendant a bribe in order to obtain CrossTalk's contract with CBS. If that is what the individual plaintiffs did—pay a bribe to obtain a contract—then the doctrine of unclean hands would apply to bar their claim for damages caused by losing that very contract.

The individual plaintiffs argue, however, that the word "secure" was used in the complaint in the second sense noted above. Applying the second sense, the complaint alleges that the individual plaintiffs were forced to accede to defendant's extortionate demands in order to safeguard the finalization of a contract which had already been negotiated between CBS and CrossTalk, and which would be finalized without incident in the absence of extortionate interference by defendant. This "safeguarding" was necessary, according to a fair reading of the complaint, only because of defendant's extortionate threats. If what actually happened here is the second scenario—an extortionate scheme perpetrated by defendant to take advantage of plaintiffs' vulnerable position—there appears to be no authority which would bar plaintiffs from recovering against defendant merely for trying to avoid the damage which might follow if defendant's extortionate threats were carried out. So long as no bribe was paid to obtain CrossTalk's contract with CBS, and the contract was hence awarded on the merits, the moral culpability of defendant would be far and away greater than any which would attach to CrossTalk and the individual plaintiffs. The defendant would then not be shielded by the individual plaintiffs' failure to resist his extortionate demands. To construe the doctrine of unclean hands otherwise would be to transform the doctrine into protection for extortionists. Unclean hands is an equitable doctrine. The proposition that it is not equitable to protect extortionists against liability for the injuries caused to their victims should not require an elaborate defense.

Ironically, this case would probably not be on appeal had counsel chosen some word other than "secure" to describe what happened. Or, the entire passage in which the word "secure" appears could have been deleted without detracting materially from the complaint. The complaint alleges that the plaintiffs "had no reasonable alternative under these circumstances but to accede to [defendant's] demand in order to *secure* CrossTalk's contract with CBS." (Italics added.) If this passage had been ended with a period after the word "demand," this appeal might have been unnecessary. While precision is generally a virtue, counsel drafting a complaint can hardly be expected to

anticipate that a word such as "secure" will be construed as necessarily constituting an adverse admission, much less that leave to amend will then be denied. Courts should not sustain demurrers without leave to amend based on such ambiguities. Instead, leave to amend should be granted to clarify the ambiguity.

### B. *The Blain test for unclean hands.*

Since the doctrine of unclean hands is heavily fact dependent, it is a uniquely poor candidate to support a demurrer. Nevertheless, there have been unusual situations in which a defense of unclean hands has been established solely by the allegations of the complaint. (See, e.g., *Blain* v. *Doctor's Co.* (1990) 222 Cal.App.3d 1048 [272 Cal.Rptr. 250].) *Blain* recently examined the unclean hands doctrine in detail. ▮▮▮ The court recognized that "unclean hands" is not one but rather a number of doctrines, each *"dependent for their substance on the context of application."* (*Id.* at p. 1059, italics added.) For example, the court quoted with approval the Restatement Second of Torts section 889: " 'One is not barred from recovery for an interference with his legally protected interests *merely* because at the time of the interference he was committing a tort or a crime . . . .' " (222 Cal.App.3d at p. 1060, italics in original.) Regardless of whether a plaintiff was committing a tort or even a crime at the time his injury occurred, the question is the same: whether " ' *"under the circumstances* there should be an application of that rule of equity which denies relief to one party against another when both have been engaged in a fraudulent transaction . . . ." ' " (*Id.* at p. 1062, italics in original; *Clark* v. *Millsap* (1926) 197 Cal. 765 [242 P. 918].) Finding no bright line theory of application, the court stated: "We glean from this sparse product that whether there is a bar depends upon the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries." (*Blain, supra,* 222 Cal.App.3d at p. 1060.) At least one court has referred to this three prong analysis as "the *Blain* test." (See *Unilogic, Inc.* v. *Burroughs Corp.* (1992) 10 Cal.App.4th 612, 618-619 [12 Cal.Rptr.2d 741].)

Defendant relies heavily on *Blain.* In *Blain,* plaintiff doctor was suing his lawyer for legal malpractice. The doctor alleged that he had suffered damages by lying at a deposition, allegedly on the advice of his lawyer, in a lawsuit in which he was being sued for medical malpractice. The question was whether unclean hands precluded the doctor's action against the lawyer for legal malpractice. Reviewing the doctor's amended complaint in conjunction with more candid allegations in his original complaint, the court found: "On this reading Blain alleges that *he* committed serious misconduct which was the cause of his injuries. This leads to consideration of the law of

unclean hands." (*Blain* v. *Doctor's Co.*, *supra*, 222 Cal. App. 3d at p. 1058, italics in original.) The *Blain* court found that under the doctrine of unclean hands, plaintiff had no cause of action for injuries necessarily caused by his own misconduct: "Blain's emotional distress, if any, is attributable to his own knowing misbehavior. Even the most naive must know that lying under oath is illegal. . . . [T]he relationship of misconduct to harm in this case is direct and not incidental. The misconduct was, so it is alleged, the instrumentality of harm." (*Blain*, *supra*, 222 Cal.App.3d at p. 1063.) The court similarly disposed of Blain's claim to have lost the ability to practice medicine, finding his misconduct "inherently involved" that risk. (*Id.* at p. 1064.)

*Blain* does not compel the conclusion that plaintiffs are barred from suing for the allegedly extortionate actions of defendant. The first prong of the "*Blain* test" is analogous case law. Defendant has cited no authority finding unclean hands generally to be a defense to claims for extortion or "economic duress" in other factual circumstances, or generally to be a defense to claims for intentional or negligent infliction of emotional distress. Defendant's authorities merely confirm that application of the unclean hands doctrine depends upon the circumstances of the case, the nature of the claims asserted, and comparison of the parties' conduct—factual inquiries. "[I]t is not every wrongful act nor even every fraud which prevents a [plaintiff] from obtaining relief." (*Fibreboard Paper Products* v. *East Bay Union of Machinists*, *supra*, 227 Cal.App.2d at p. 728.)

The second prong of the "*Blain* test" requires examination of "the nature of the misconduct." Defendant argues in this vein that plaintiffs' allegations necessarily constitute an admission of bribery. However, whether plaintiffs did or did not admit bribery would be immaterial *if* the facts alleged otherwise necessarily established bribery. ▮ A demurrer on the ground of unclean hands does not require that the plaintiff admit the legal conclusion that his conduct was wrongful. (*Blain* v. *Doctor's Co.*, *supra*, 222 Cal.App.3d at p. 1058.) ▮ And, as discussed above, the use of the word "secure" cannot be interpreted as a binding admission of bribery. Focusing on *Blain*'s second prong, the "nature of the misconduct," here the allegations show that defendant instigated the misconduct and that the moral blame attributable to him far outweighs any attributable to plaintiffs. Hence *Blain*'s second prong does not support an unclean hands defense on these allegations.

The final prong of the *Blain* test requires examination of the relationship between plaintiff's misconduct and the claimed injuries. Here, plaintiffs allege that they reasonably feared loss of a legitimately obtained contract,

which constituted their sole source of support, if defendant carried out his alleged extortionate threats. To forestall this possibility, they initially paid defendant what he demanded in order to induce him not to carry out his threats. When defendant's demands escalated, and plaintiffs consequently advised CBS of what had occurred, they suffered the very injury they sought to avoid by acceding to defendant's extortionate demands—loss of CrossTalk's contract with CBS. A fair inference could be drawn that the underlying cause of the damage to plaintiffs was defendant's extortionate demands. The allegations here are unlike the situation in *Blain.* Here, plaintiffs had nothing to gain by paying defendant other than forestalling conduct in which defendant had no right to engage. In *Blain,* the plaintiff attempted to avoid liability by lying. This instant situation as alleged is not analogous.

## C. *Commercial bribery.*

 The allegations of the complaint do not compel the conclusion that plaintiffs necessarily committed commercial bribery. (Pen. Code, § 641.3.)[4] The commercial bribery statute provides that either (1) an "employee" who solicits or receives money or anything of value (other than in trust for his "employer"), "corruptly" and in return for using his position to benefit another person, or (2) the person who offers or gives the "employee" money or anything of value "under those circumstances," is guilty of commercial bribery. (*Ibid.*) "Corruptly" is defined to mean the person "specifically intends to injure or defraud" either his own employer, the employer of the person on the other side of the transaction, or a competitor of "any such employer." (*Id.,* subd. (d)(3).) The facts alleged here do not necessarily establish that plaintiffs intended to injure or defraud anyone. The alleged facts are that plaintiffs initially obtained CBS's agreement to a contract

---

[4]Penal Code section 641.3 provides in pertinent part:

"(a) Any employee who solicits, accepts, or agrees to accept money or any thing of value from a person other than his or her employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person, and any person who offers or gives an employee money or any thing of value under those circumstances, is guilty of commercial bribery.

"⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"(d) For purposes of this section:

"(1) 'Employee' means an officer, director, agent, trustee, partner, or employee.

"(2) 'Employer' means a corporation, association, organization, trust, partnership, or sole proprietorship.

"(3) 'Corruptly' means that the person specifically intends to injure or defraud (A) his or her employer, (B) the employer of the person to whom he or she offers, gives, or agrees to give the money or a thing of value, (C) the employer of the person from whom he or she requests, receives, or agrees to receive the money or a thing of value, or (D) a competitor of any such employer."

untainted by any payment or agreement to pay defendant. Although plaintiffs subsequently feared "losing" the "promised contract," and paid defendant to "secure" the contract, the complaint alleges the contract was "approved" before any demand for payment by defendant. The complaint does not necessarily demonstrate any intent on the part of plaintiffs that CBS not receive the full benefit of a market value bargain or that plaintiffs obtained a contract improperly. It is therefore questionable whether the allegations can be construed as an admission of commercial bribery, since intent to injure or defraud CBS is absent if CBS was intended to receive full market value, and could not have obtained any better service elsewhere.

D. *"Economic duress," duress generally, and related theories.*

■ The doctrine of "economic duress" can apply when one party has done a wrongful act which is sufficiently coercive to cause a reasonably prudent person, faced with no reasonable alternative, to agree to an unfavorable contract. (*Rich & Whillock, Inc.* v. *Ashton Development, Inc.* (1984) 157 Cal.App.3d 1154, 1158 [204 Cal.Rptr. 86].) The party subjected to the coercive act, and having no reasonable alternative, can then plead "economic duress" to avoid the contract. The instant case directly concerns not economic duress, but instead an allegation of extortion. Plaintiffs, however, used the term "economic duress" in their complaint, and the parties have consequently briefed the subject extensively. The economic duress cases do appear to be the type of "analogous case law" referenced in the first prong of the *Blain* test, and the treatment of the "reasonable alternative" issue in the economic duress cases is instructive.

When a party pleads economic duress, that party must have had no "reasonable alternative" to the action it now seeks to avoid (generally, agreeing to a contract). If a reasonable alternative was available, and there hence was no compelling necessity to submit to the coercive demands, economic duress cannot be established. Whether the party asserting economic duress had a reasonable alternative is determined by examining whether a reasonably prudent person would follow the alternative course, or whether a reasonably prudent person might submit. (See, e.g., *Louisville Title Ins. Co.* v. *Surety Title & Guar. Co.* (1976) 60 Cal.App.3d 781, 802 [132 Cal.Rptr. 63].) Clearly this inquiry is a factual one, rarely if ever susceptible to determination on demurrer. Similarly, in applying the *Blain* test (three prongs: examining analogous case law, the nature of plaintiffs' misconduct, and the relationship of plaintiffs' misconduct to plaintiffs' injuries), it might be asked whether plaintiffs' conduct was coerced, or whether plaintiffs had a reasonable alternative.

■ Plaintiffs also cite the related concept of an exception to the unclean hands doctrine which allows a party relief even if that party has

been guilty of wrongdoing. The exception can apply if the party seeking relief is the one "least at fault." The rule is ordinarily invoked where the party seeking relief is not a "free moral agent," and his participation in the wrongdoing is the result of the undue influence, menace or duress of the other party. (See, e.g., *Belling* v. *Croter* (1943) 57 Cal.App.2d 296, 304-305 [134 P.2d 532].) As one court described "duress" in a related context (a suit to set aside a settlement which was allegedly the product of threats to reveal "secret" unfavorable information): "The question of duress . . . is a factual question; the existence of duress always depends upon the circumstances." (*Philippine Export & Foreign Loan Guarantee Corp.* v. *Chuidian* (1990) 218 Cal.App.3d 1058, 1078 [267 Cal.Rptr. 457].)

Defendant argues there is no cause of action for "economic duress." It appears, however, that the Supreme Court has noted a general "right . . . to be free from acts constituting duress" (*Leeper* v. *Beltrami* (1959) 53 Cal.2d 195, 202 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803]) and the propriety of a "cause of action for wrongful acts in the nature of duress . . . ." (*Id.* at p. 203.) Such duress may consist of threats to business or property interests. (*Ibid.*) The "wrongful act" must be sufficiently coercive to cause a reasonably prudent person to be faced with no reasonable alternative but to "succumb." Examples of such "wrongful acts" include the assertion of a claim known to be false, a bad faith threat to breach a contract or a threat to withhold a payment. (*Rich & Whillock, Inc.* v. *Ashton Development, Inc.*, *supra,* 157 Cal.App.3d at p. 1159.)

In *Rich & Whillock*, a "start up" corporation sued on a contract and was required to argue the economic duress doctrine to avoid being barred from recovery by a release it had signed in order to obtain a reduced payment under the contract. Although there was no "affirmative" claim pleaded for "economic duress," the court's discussion of the basis for the doctrine provides support for the proposition that claims such as "economic duress" can be asserted offensively. "The underlying concern of the economic duress doctrine is the enforcement in the marketplace of certain minimal standards of business ethics. . . . They include equitable notions of fairness and propriety which preclude the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value. . . . The economic duress doctrine serves as a last resort to correct these aberrations when conventional alternatives and remedies are unavailing." (*Rich & Whillock, Inc.* v. *Ashton Development, Inc.*, *supra,* 157 Cal.App.3d at p. 1159.)

Moreover, allied theories are potentially applicable to the facts alleged here. Plaintiffs' allegations do not negate the possibility of amendment to state a cause of action for interference with prospective economic advantage,

for example. ▮ "The tort of intentional . . . interference with prospective economic advantage imposes liability for improper methods of disrupting or diverting the business relationship of another which fall outside the boundaries of fair competition. [Citation.]" (*Settimo Associates* v. *Environ Systems, Inc.* (1993) 14 Cal.App.4th 842, 845 [17 Cal.Rptr.2d 757].) " 'The elements of the tort include (1) the existence of a prospective business relationship containing the probability of future economic rewards for plaintiff; (2) knowledge by defendant of the existence of the relationship; (3) intentional acts by defendant designed to disrupt the relationship; (4) actual causation; and, (5) damages to plaintiff proximately caused by defendant's conduct. [Citation.] The general wrong inherent in this tort is the unlawful interference with a business opportunity through methods which are not within the privilege of fair competition. [Citation.]' " (*PMC, Inc.* v. *Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 595 [52 Cal.Rptr.2d 877].) To plead this theory, a plaintiff must also plead that the defendant "engaged in conduct that was wrongful by some legal measure other than the fact of interference itself" (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.,* (1995) 11 Cal.4th 376, 393 [45 Cal.Rptr.2d 436, 902 P.2d 740]), but that is certainly within the scope of the allegations here. Although, as a general proposition, this theory is unavailable against a party to the contract or relationship from which the anticipated economic advantage would arise (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 513 [28 Cal.Rptr.2d 475, 869 P.2d 454]; *Kasparian* v. *County of Los Angeles* (1995) 38 Cal.App.4th 242 [45 Cal.Rptr.2d 90]), and generally corporate officers acting on behalf of the corporation cannot be held liable for interfering with the employer's contracts (see *Marin* v. *Jacuzzi* (1964) 224 Cal.App.2d 549, 553-554 [36 Cal.Rptr. 880]), these protections may not apply to defendant if it can be shown that he was acting not for CBS, but for himself. (See *Aalgaard* v. *Merchants Nat. Bank, Inc.* (1990) 224 Cal.App.3d 674, 684 [274 Cal.Rptr. 81].)

### E. *The Jacobs case.*

The case of *Jacobs* v. *Universal Development Corp.* (1997) 53 Cal.App.4th 692 [62 Cal.Rptr.2d 446] is also instructive as part of the "analogous case law" forming the first prong of the *Blain* test. The plaintiff in *Jacobs* was a marketing director for four residential developments in San Diego. In addition to his salary, he received a commission for every escrow closed. Shortly after his employment began, he learned that his employer was rebating a portion of the purchase price on federally financed sales. These rebates resulted in federal lenders financing a higher percentage of a purchase price than the federal limit of 80 percent. The plaintiff protested, but his employer continued the practice. Fearing that he would be fired if he complained

further, the plaintiff ceased his complaints and continued working. He subsequently initialed and forwarded to his superiors 12 purchase offers containing illegal rebates, and received commissions on the sales that followed. Later, his employer advised the plaintiff that henceforth the plaintiff would have to act as broker of record for the company's sales in San Diego. The plaintiff responded that he would not act as broker of record on sales including an illegal rebate, and was fired. He sued. His employer moved for summary judgment based on the affirmative defense that the plaintiff and his employer were "in pari delicto," and that the plaintiff was consequently barred from using the judicial process for redress. The trial court granted the motion. The plaintiff appealed. The appellate court reversed.

The *Jacobs* court stated that "[i]n pari delicto means, '[i]n equal fault; equally culpable or criminal; in a case of equal fault or guilt.' (Black's Law Dict. (6th ed. 1990) p. 791, col. 1.) According to Witkin, '[*h*]*e who comes into equity must come with clean hands.* A court will neither aid in the commission of a fraud by enforcing a contract, nor relieve one of two parties to a fraud from its consequences, where both parties are *in pari delicto*.' (11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 8, p. 684, original italics.) The doctrine ' "closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." ' (*Id.* at pp. 684-685.) 'In California, the doctrine of unclean hands may apply to legal as well as equitable claims [citation] and to both tort and contract remedies. [Citations.]' (*Camp* v. *Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 638 [41 Cal.Rptr.2d 329].)

"In *Norwood* v. *Judd* (1949) 93 Cal.App.2d 276, 288-289 [209 P.2d 24 [209 P.2d 24], the court discussed the doctrine's applicability in the following oft-quoted passage: 'The rule that the courts will not lend their aid to the enforcement of an illegal agreement or one against public policy is fundamentally sound. The rule was conceived for the purposes of protecting the public and the courts from imposition. It is a rule predicated upon sound public policy. But courts should not be so enamored with the Latin phrase "*in pari delicto*" that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be

applied.' " (*Jacobs* v. *Universal Development Corp.*, *supra*, 53 Cal.App.4th at pp. 699-700.)

The *Jacobs* court went on to find that the employer had failed to meet its burden on a summary judgment motion of proving its entitlement to judgment as a matter of law, because its evidence showed only that the plaintiff "while consistently protesting to his immediate supervisors—acquiesced in [the employer's] illegal rebate program because he presciently feared being fired if he did not. [The plaintiff] is not suing to enforce the terms of an illegal agreement, and he need not rely on any culpability of his own to prove entitlement to tortious discharge damages. . . . [¶] . . . [¶] . . . Any illegal conduct of [the plaintiff] is completed, not executory, and this action is not founded on any illegal or immoral act of [the plaintiff]. While [the plaintiff's] conduct cannot be condoned, it was motivated by the realistic fear of losing his job, and thus his initialing of purchase offers including illegal rebates and accepting the standard $125 commissions on such sales, did not involve reprehensible moral conduct. Certainly, there was no moral turpitude involved in [the plaintiff's] ultimate refusal to participate in [the employer's] rebate program, and to the contrary an employee initially acquiescing in his employer's criminality should be encouraged to cease such activity and not left without recourse when he is consequently fired. [The employer] was guilty of the greatest moral fault as it instigated the illegal rebate program, proceeded with it over [the plaintiff's] protests, and then abruptly fired him after he refused further participation. And, finally, application of the doctrine would unjustly enrich [the employer] and violate fundamental public policy by allowing it to condition continued employment on criminal conduct." (*Jacobs* v. *Universal Development Corp.*, *supra*, 53 Cal.App.4th at pp. 701-703.)

■ The instant case is analogous. Plaintiffs in the instant case do seek damages for the loss of CrossTalk's contract with CBS, and thus indirectly do seek—in effect—to enforce that contract. However, if the contract was not obtained by bribery, plaintiffs are not seeking—even indirectly—to enforce a contract obtained by illegal means. As in *Jacobs,* there are no illegal executory acts to be performed. Similar to *Jacobs*, plaintiffs' actions (paying defendant) were motivated by the "realistic fear of losing" their contract with CBS. (53 Cal.App.4th at p. 702.) The same as in *Jacobs*, there was no moral turpitude involved in plaintiff's ultimate decision to refuse further payments, and defendant "was guilty of the greatest moral fault as it instigated the illegal [payment] program." (*Ibid.*) Finally, just as in *Jacobs*, allowing defendant to escape liability would unjustly enrich defendant and would allow defendant to condition continued employment on acquiescence to his extortionate demands. Thus although *Jacobs* was a wrongful termination case, while the instant case pleads in essence a claim of interference

with contract or prospective economic advantage, the reasoning of *Jacobs* supports the allowance of a remedy in the instant case as well. Considering *Jacobs* as part of the analogous case law making up the first prong of the *Blain* test for unclean hands, neither *Blain* itself nor *Jacobs* supports a defense of unclean hands on the allegations in plaintiffs' complaint.

## IV. CONCLUSION.

As the discussion above demonstrates, the "secure" problem can easily be cured by amendment, and the face of the complaint does not otherwise necessarily establish a case of commercial bribery. The three prongs of the *Blain* test were not established by the pleadings, and a defense of unclean hands therefore cannot support a demurrer here. Plaintiffs can easily choose a label other than "economic duress" for their theory that defendant caused them to lose their contract with CBS. Hence there is ample basis for successful amendment and possible eventual recovery against defendant. It was therefore error for the trial court to sustain the demurrer without leave to amend.

## V. DISPOSITION.

The judgment of dismissal is reversed with directions to vacate the order sustaining the demurrer without leave to amend and to allow appellants leave to amend. Plaintiffs (appellants) to recover costs on appeal.

Fukuto, Acting P. J., and Nott, J., concurred.