Filed 7/31/15; unmodified opn. attached

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059103 |
| v. | (Super.Ct.No. RIF10000395) |
| JAMES WILLIAM RILEY et al., | **ORDER MODIFYING OPINION** |
| Defendants and Appellants. | [NO CHANGE IN JUDGMENT] |

THE COURT

     The opinion filed in this matter on July 21, 2015, is modified as follows:

1

The last sentence beginning on page 6 and continuing on page 7, which reads, "The total fees and commissions paid to RGA . . . ," should read:  A forensic accountant who testified for the prosecution stated that the total fees and commissions paid to RGA on this group of policies amounted to approximately 24.5 percent of the premiums.

On page 7, in footnote No. 5, remove the word "Cooper" and replace it with "The witness."  The first sentence of footnote No. 5 should read:  The witness based his calculations on net premium, i.e., the gross premium less the commissions and fees.

These modifications do not change the judgment.

CERTIFIED FOR PUBLICATION


McKINSTER _____
J.

We concur:


RAMIREZ _____
P. J.


KING _____
J.


2

Filed 7/21/15 (unmodified version)

**CERTIFIED FOR PUBLICATION**


**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**


| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059103 |
| v. | (Super.Ct.No. RIF10000395) |
| JAMES WILLIAM RILEY et al., | OPINION |
| Defendants and Appellants. | |


APPEAL from the Superior Court of Riverside County. Mac R. Fisher, Judge. Affirmed in part; reversed in part.

Reed Webb, under appointment by the Court of Appeal, for Defendant and Appellant James William Riley.

Sarah A. Stockwell, under appointment by the Court of Appeal, for Defendant and Appellant Ryan Jay Robinson.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Collette

1

Cavalier and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants James William Riley and Ryan Jay Robinson appeal their convictions on three counts each of commercial bribery, in violation of Penal Code section 641.3, subdivision (a).[1] The charges are based on the premise that Riley, who was the insurance broker for Pechanga Resort and Casino, paid bribes to Robinson, who was the chief financial officer of the casino, in order to permit Riley to charge excessive fees for insurance products he obtained for the casino.

On appeal, defendants assert that there is insufficient evidence that they acted "corruptly," i.e., with the specific intent to injure or defraud Robinson's employer, as required by the statute. (§ 641.3, subds. (a), (d)(3).) They also assert, in response to our request for supplemental briefing, that there is insufficient evidence to support their convictions on two of the counts against each of them because the evidence showed that as of the date of those charged offenses, Robinson was no longer employed by Pechanga Resort and Casino.

We conclude that the evidence that Robinson was not employed by Pechanaga Resort and Casino as of the dates alleged in counts 6 through 9 compels reversal of the defendants' convictions on those counts. However, we also conclude that there is substantial evidence to support their convictions on counts 4 and 5.

_____

[1] All further statutory citations refer to the Penal Code.

2

## PROCEDURAL HISTORY

The grand jury indicted Riley and Robinson on three counts of grand theft (§ 487, subd. (a); counts 1-3) from Pechanga Resort and Casino, and indicted each of them on three counts of commercial bribery (§ 641.3, subd. (a); counts 4, 6, 8 (Riley) and 5, 7, 9 (Robinson)). As to each count of commercial bribery, the indictment alleged that the bribe paid or accepted was in excess of $1,000. The grand jury also indicted Riley on three counts of money laundering. (§ 186.10, subd. (a); counts 10-12.) The indictment alleged that in count 12, the transaction exceeded $50,000, within the meaning of section 186.10, subdivision (c)(1)(A), and alleged that both defendants committed two or more related felonies involving embezzlement as a material element and that the pattern of felonies involved the taking of more than $500,000, within the meaning of section 186.11, subdivision (a)(2).

At defendants' first trial, counts 2 and 3 were submitted to the jury only as to Riley. The jury was unable to return a verdict as to any count of the indictment. Upon motion by the defendants, the trial court dismissed counts 1 through 3 and 10 through 12, as well as the special allegations related to those counts, in the interest of justice. The court cited insufficient evidence to support a finding of guilt beyond a reasonable doubt. The court set the remaining counts for retrial.

Following a second trial, Riley was found guilty on counts 4, 6 and 8, and Robinson was found guilty on counts 5, 7 and 9. The jury found true the allegations that each count involved a bribe in excess of $1,000. As to Riley, the court imposed the lower

term of one year four months on count 4 with consecutive terms of eight months on counts 6 and 8, and imposed associated fines and fees. As to Robinson, the court imposed the lower term of one year four months on count 5 with consecutive terms of eight months on counts 7 and 9, and imposed associated fines and fees. Each defendant filed a timely notice of appeal.

### STATEMENT OF FACTS

Defendant James Riley had been a licensed commercial insurance broker since 1989. In 1996, while working for a firm called Austin Cooper and Price, he obtained the account of Pechanga Development Corporation (PDC).[2] He took the account with him when he left that firm and went to work for Dodge Warren and Peters. In 2002, he left Dodge Warren and Peters and opened his own firm, Riley Garrison and Associates (RGA). At that point, Riley was designated broker of record by Anthony Miranda, the PDC board member responsible for insurance matters. Miranda and Riley had known each other since junior high school, but Riley did not know that Miranda worked for PDC

---

[2] Pechanga Resort and Casino is operated by Pechanga Development Corporation, or PDC. PDC is one of three "entities" which are the operating constituents of the Pechanga tribe (officially named the Pechanga Band of Luiseño Indians; see <http://www.pechanga-nsn.gov> [as of July 21, 2015].) PDC operates all business operations of the tribe. A second entity is the tribal government. That entity operates in effect as a city council for the tribal reservation. A third entity is the Pechanga Gaming Commission, which oversees gaming compliance at the casino. The three entities are separate from one another, and employees of one entity are not employees of either of the other two. (We discuss this in greater detail elsewhere in this opinion.)

The focus in this case was on insurance transactions for the casino, to which the parties frequently referred simply as "Pechanga."

4

when he first sought the account in 1996.[3]  Although he initially dealt with Miranda and the board on PDC insurance matters, after 2001 or 2002, he dealt with Robinson.

Approximately four years after Riley obtained the account, Robinson became the chief financial officer (CFO) for Pechanga Resort and Casino.  (Hereafter sometimes "the casino.")  As CFO, Robinson was responsible for insurance for the casino.  Robinson had worked for the casino for several years before he became CFO, and during that time he and Riley had become friends.

On a number of occasions, beginning in April 2005, Riley gave Robinson large sums of money in the form of cashier's checks.  Riley transferred the money from RGA's operating account into his personal savings account and then obtained the cashier's checks.  Riley testified that the payments were personal loans or gifts motivated solely by friendship and, in one instance, an investment in a business Robinson was involved with, unrelated to Pechanga.  He denied that the payments were related to or intended to influence Robinson with respect to Pechanga's insurance.

---

[3]  Although the parties and the witnesses sometimes referred to Riley's relationship with Miranda, there is no evidence that Miranda had any involvement in the events which are the subject of the prosecution.  Miranda did not testify at the trial.

The first such payment took place in April 2005. This incident was not one of the charged offenses, but was offered to show the beginning of the pattern of activity. On April 28, 2005, $55,000 was deposited into Riley's personal savings account. On that same date, $55,000 was withdrawn from the account and a cashier's check in the amount of $40,000 was issued to Robinson, who negotiated the check. On March 24, 2005, Pechanga had issued a check in the amount of $869,942.28, to Riley's firm (RGA) as the down payment on a contract to finance several insurance policies. (Financing of large commercial insurance premiums is a common practice.) The financing agreement, which was actually issued on March 31, 2005, showed a total premium for three policies and did not reflect any broker's fees. A revised financing agreement for the same three policies, issued April 29, 2005, showed the same total premium as the March 31, 2005 agreement. However, the premiums charged by two of the three insurance companies were reduced by a total of $1,441,000, but the financing agreement showed a broker's fee of $1,441,000.[4] In addition, the financing agreement showed a broker's fee in the amount of $538,200 on other policies being financed under the same agreement, in addition to the commission which was shown on the policies themselves. The total fees and

_____

[4] It is a common practice in the industry to charge a broker's fee in lieu of a commission or in addition to a commission. A broker will commonly charge a fee if the policy does not carry a commission or if he or she determines that the commission is inadequate to provide a reasonable profit. The parties stipulated that the Insurance Code does not limit the amount of fees and/or commissions relating to commercial insurance policies and that it does not require a broker to disclose fees or commissions relating to commercial insurance policies.

commissions paid to RGA on this group of policies amounted to approximately 24.5 percent of the premiums.[5]

On March 30, 2006, RGA invoiced Pechanga for a deposit on the April 1 renewal of a policy issued by Hudson Insurance Company. The invoice was for $1,682,148.45. The financing agreement dated March 31, 2006, showed that the down payment was to be $1,091,606.45. The total premium on the policy was $8,200,000. On a revised financing agreement for the same policy, dated April 6, 2006, the policy premium was shown as $7,380,000, a difference of $820,000. On the April 6 financing agreement, the fee charged by RGA was increased by that amount over the March 31 financing

---

[5] Cooper based his calculations on net premium, i.e., the gross premium less the commissions and fees. He acknowledged that testimony from experts in the insurance industry (called by the prosecution) had established that the compensation is based on the gross premium. Based on the total dollar sales, however, RGA's profit on the Pechanga account in 2006 was 20.8 percent. Jerry Konchar, the CFO of PDC, testified that the brokers PDC now uses charge commissions ranging from 15 to 20 percent.

agreement.[6,7]  On April 27, 2006, Riley transferred $60,000 from the RGA operating account into his savings account.  On that same date, he used funds from his savings account to issue a cashier's check to Robinson, in the amount of $50,000.  The check was deposited to Robinson's bank account.

On June 8, 2006, a financing agreement from FIFC required a renewal down payment in the amount of $167,926.20.  The balance of the premium was $1,511,335.80.  RGA invoiced Pechanga for $367,926.20 for the renewal down payment.  On July 11, 2006, $50,000 was transferred from RGA's general account into Riley's savings account.  On that same date, Riley withdrew $20,000 from his savings account and obtained a cashier's check in that amount, payable to Robinson.  Robinson deposited the check into his bank account.

---

[6] RGA did not provide financing.  Financing was provided by First Insurance Funding Corporation (FIFC).  FIFC was not involved in negotiating premiums or broker fees.  It is standard in the industry that a broker or agent could add a percentage to the finance rate, called a "bump."  This is typically not disclosed on the financing agreement.  Other fees imposed by the broker may "exist outside the scope of the financing agreement," i.e., paid separately by the insured and not financed, or financed in part.  It is typical for a broker to include at least a portion of the fee in the deposit.

[7] At oral argument, counsel for Riley argued that we have misunderstood some of the documentary evidence.  Counsel were notified that along with their opening briefs, they should submit a request for transmission of any exhibits they deemed necessary to their arguments.  Neither defendant submitted a request for transmission of exhibits, nor did either defendant seek to augment the record to include any exhibits.  Accordingly, our review of the evidence was limited to the testimony.

On July 28, 2006, FIFC issued a financing agreement for premiums totaling $11,600,000. The agreement required a cash down payment in the amount of $1,160,000. Pechanga paid RGA's invoice for $1,160,000 for the down payment on August 22, 2006.

On August 16, 2006, $100,000 was deposited to Riley's savings account. On that same date, $80,000 was withdrawn from the account, and four cashier's checks, each in the amount of $20,000, were made payable to Robinson. All were deposited into Robinson's bank account.

The $11.6 million transaction in July and August 2006 ultimately lead to the discovery of the outside financial dealings between Riley and Robinson. That transaction was for obtaining additional "difference in conditions" (DIC) insurance, which covered property losses from earthquake and flood. Pechanga's DIC policy ran from April to April. In insurance years 2005-2006, Pechanga carried approximately $1.2 billion dollars in DIC insurance. In 2006, the availability of such insurance became severely limited as a result of Hurricane Katrina,[8] and premiums had greatly increased. In April 2006, Riley was able to obtain only $380 million in DIC coverage, for which the casino paid approximately $8.7 million. In July 2006, Nancy Veeh, one of the wholesale insurance brokers Riley used to procure DIC insurance for Pechanga, alerted him that some

---

[8] Hurricane Katrina made landfall in Louisiana and Mississippi on August 29, 2005. (<http://www.cnn.com/2013/08/23/us/hurricane-katrina-statistics-fast-facts> [as of July 21, 2015].)

additional coverage might be available.[9] She told him that because of the highly competitive market, he would need to obtain a firm commitment from the casino for the projected cost of the insurance, which she placed at approximately $9,817,222 for the premium alone, exclusive of any fees the various brokers involved in the transaction would impose. The transaction involved three layers of coverage from three carriers. The largest layer, which was projected to cost $7.25 million, did not carry a commission.

Robinson approved the purchase of the additional DIC coverage and signed the financing agreement for $11.6 million for the package of coverage which would bring the total DIC coverage up to $700,000,000.

By the time this transaction took place, Robinson was no longer Pechanga's CFO. In May 2006, Robinson had been hired by the Pechanga Tribal Government as its CFO. Jerry Konchar, the CFO of PDC, took over as interim CFO of the casino until a permanent replacement could be hired. Robinson told Konchar he was going to continue to handle the casino's insurance, and Konchar apparently agreed to this because he was immersed in an annual audit which needed to be completed and a report filed with the

---

[9] Wholesale brokers have access to certain types of insurance to which retail brokers such as Riley do not. DIC insurance is one of them. Two commercial brokers who were involved in obtaining DIC insurance for the Pechanga casino testified that in any year, there is only a certain amount of DIC insurance available for tribal casinos on the world market. In 2005-2006, there was far less coverage available than in prior years because of the tremendous losses caused by Hurricane Katrina.

NIGC, or National Indian Gaming Commission.[10]  The report was late, and completing the audit was Konchar's priority.

The invoice for the premium financing the down payment for the DIC insurance was sent to Robinson.  The down payment was $1.16 million.  Robinson issued a check request, which was eventually forwarded to Konchar, along with the invoice.  Konchar had previously signed off on a check request issued by Robinson for an insurance policy renewal in the amount of approximately $12,500, which he did not question, but he was unwilling to sign off on the request for $1.16 million.  Konchar was familiar with property insurance in general, but not with DIC insurance, and he did not understand why it was so expensive.  There was no insurance information in Robinson's office, so Konchar was unable to determine the basis for the $1.16 million down payment.  Konchar testified that he did not understand why the cost of the DIC insurance had more than doubled from April 2006 to August 2006.  In meetings and via emails to Konchar,

_____

[10]  See <http://www.nigc.gov> (as of July 21, 2015).

Riley and Robinson explained the reasons that the DIC premium was so high.[11]

Nevertheless, Konchar and Robinson's permanent successor, Tjeerd Brink, apparently

remained skeptical, and an investigation ensued.[12]

Ironically, Riley was able to obtain more DIC insurance in 2006 for the Pechanga

casino than almost any of the other tribal casinos in California, and at lower cost per

million than most. Accordingly, despite Konchar and Brinks' suspicions, there was in

fact nothing untoward about the July 2006 transaction involving DIC insurance, except,

arguably, the size of Riley's fee.[13] Neither Konchar nor Brink, however, ever asked

Riley how much of cost of the DIC insurance consisted of his fees or commissions.

---

[11] Konchar testified that before a meeting with Riley and Robinson on August 22, 2006, Robinson never provided him with any information about the DIC insurance, other than the invoice and an amortization schedule, and that even at the meeting Riley did not provide much information. On cross-examination, however, it became clear that Robinson and Riley had in fact provided him with a great deal of information, including an email from Nancy Veeh which explained the issues concerning DIC coverage in the aftermath of Hurricane Katrina. Ron Randazzo, the casino risk manager, told Konchar that based on the information they had received, he believed that Robinson was correct that it was in the casino's best interest to obtain as much DIC insurance as it could. Konchar ultimately authorized the payment of the $1.16 million down payment because he did not want the casino to be in default on the loan.

[12] Konchar also described several subsequent insurance transactions with Riley which ultimately led PDC to terminate his services.

[13] Riley's fee on the August 2006 DIC transaction was apparently $2,282,567. This figure is the difference between the $11.6 million Robinson committed to and the actual premium, which ultimately turned out to be $9,317,433. Riley admitted that he used the difference as his fee.

12

The evidence showed that between 2003 and 2006, Robinson made large payments to Thomas LaValle, in connection with gambling activities and some stock purchases. Robinson also lent money to LaValle. Riley testified that Robinson also had large expenses resulting from a divorce.

LEGAL ANALYSIS

1.

THE PROSECUTION DID NOT MEET ITS BURDEN OF PROOF

WITH RESPECT TO COUNTS 6 THROUGH 9

Section 641.3 provides in relevant part, "Any *employee* who solicits, accepts, or agrees to accept money or any thing of value from a person other than his or her employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person, and any person who offers or gives an *employee* money or any thing of value under those circumstances, is guilty of commercial bribery." (Pen. Code, § 641.3, subd. (a), italics added.)

In this case, the indictment specifies three dates upon which alleged acts of commercial bribery took place: on or about April 27, 2006 (count 4 as to defendant Riley and count 5 as to defendant Robinson); on or about July 11, 2006 (count 6 as to defendant Riley and count 7 as to defendant Robinson); and on or about August 16, 2006 (count 8 as to defendant Riley and count 9 as to defendant Robinson). Each count alleges that Robinson was on the specified date an employee of Pechanga Resort and Casino. At

13

trial, however, it was undisputed that Robinson left his job with Pechanga Resort and Casino on or before May 22, 2006, and had become the chief financial officer for the Pechanga tribal government. We asked the parties to provide supplemental briefing addressing the question of whether this evidence affects the validity of defendants' convictions on counts 6 through 9.

In her supplemental brief, the Attorney General asserts that the record shows that Robinson was an employee of "Pechanga" throughout the entire period alleged in the indictment, apparently referring to the Pechanga tribe. She notes that Konchar testified, "[W]e all work for the Tribe." The indictment did not allege that Robinson was an employee of the Pechanga tribe, however; it alleged that he was an employee of Pechanga Resort and Casino. Even if it is true that employees of the casino and of the tribal government do ultimately work "for the Tribe," it is also true that not all employees of the tribe work for the casino. Konchar testified that the Pechanga tribal government was an entirely separate entity from Pechanga Resort and Casino. He described each as an "entity" of the Pechanga tribe, but testified that each had its own physical location and operating structure, and that Robinson's new position as CFO of the tribal government was not a transfer but a new job. He specifically stated that as of May 22, 2006, Robinson "was no longer an employee of the casino." Tjeerd Brink, who became the permanent CFO of the casino after Robinson moved to the tribal government, also testified that working for the tribal government is considered "a complete and separate employment from the Pechanga Resort and Casino." There was no contrary evidence.

14

Accordingly, the undisputed evidence shows that Robinson's change in employment was not an internal transfer within a single organization but rather a new job for a separate legal entity.

The Attorney General also argues that the conclusion that Robinson was "a Pechanga employee" throughout the relevant period is supported by the evidence that even after changing jobs, "Robinson still handled the purchase of property and casualty insurance for the Resort and Casino." She implies that doing so was still Robinson's job. However, at trial, the prosecutor used the fact that Robinson did *not* work for the casino when he had insurance invoices sent to him at the tribal government office and persuaded Konchar to approve them as evidence that Robinson was improperly exercising his influence to ensure that Riley's allegedly inflated fees and commissions would be paid, even though he had no authority to sign off on insurance for the casino or to approve payment for the casino's insurance. Even if it is true that Robinson was trying to induce Konchar to approve payment of the invoice for DIC insurance for a wrongful purpose— as opposed to attempting to ensure that the casino had an adequate amount of DIC insurance—however, it was undisputed that Robinson was not an employee of the casino at that time.

The prosecution has the burden of proving every element of a charged offense beyond a reasonable doubt. (*People v. Neidinger* (2006) 40 Cal.4th 67, 72.) An element of the offense of commercial bribery is that one of the parties to the illicit transaction must be an employee of the entity alleged to have been injured by the transaction.

15

(§ 641.3, subd. (a).) Here, there is no evidence that Robinson was an employee of Pechanga Resort and Casino as of the dates alleged in counts 6 through 9, as required by section 641.3. Accordingly, the convictions on those counts must be reversed.

2.

SUBSTANTIAL EVIDENCE SUPPORTS THE VERDICTS

Defendants contend that there was insufficient evidence to support the verdicts because (1) there was no evidence that any payment from Riley to Robinson was related to any specific insurance transaction, and (2) there was no substantial evidence that the defendants acted with the specific intent to injure or defraud Pechanga.[14]

Defendants contend that the evidence is insufficient because there is no evidence that any instance of money being paid to Robinson was related to any particular insurance transaction. Underlying this argument is the assumption that section 641.3 requires evidence of a direct relationship between each bribe and a specific benefit conferred, to the injury of the employer. This is a question not of the sufficiency of the evidence, but of statutory interpretation, i.e., whether the statute requires evidence of a direct quid pro quo. The meaning of a statute is a question of law which we decide de novo. (*People ex rel. Lockyer v. Shamrock Foods Co*. (2000) 24 Cal.4th 415, 432.)

---

[14] Defendants' arguments do not specifically address the sufficiency of the evidence in support of counts 4 and 5, the sole remaining counts of conviction. Rather, their arguments are directed toward evidence which applied to all counts. We address the defendants' arguments as presented in their briefs.

16

If statutory language is unambiguous, the plain meaning controls. (*People v. Dunbar* (2012) 209 Cal.App.4th 114, 117.) There is nothing in the unambiguous language of section 641.3 that supports the conclusion that a direct quid pro quo is required. Rather, the statute requires proof that a bribe was offered and accepted or solicited and given with the specific intent to injure or defraud the employer. (§ 641.3, subds. (a), (c).)[15] Assuming that there is substantial evidence of the requisite intent, evidence that Robinson received a number of gratuities from Riley and as a result looked the other way while Riley charged excessive fees to the casino would satisfy the statute, even if no specific gratuity can be tied to any particular instance of overcharging. We next address the sufficiency of the evidence as to that intent.

In reviewing a claim of insufficient evidence, we review the entire record to determine whether it contains substantial evidence to support the judgment or finding in question. (*People v. Johnson* (1980) 26 Cal.3d 557, 577.) We review the evidence

_____

[15] In pertinent, part, section 641.3 provides:

"(a) Any employee who solicits, accepts, or agrees to accept money or any thing of value from a person other than his or her employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person, and any person who offers or gives an employee money or any thing of value under those circumstances, is guilty of commercial bribery. [¶] . . . [¶]

"(d) For purposes of this section: [¶] . . . [¶]

"(3) "Corruptly" means that the person specifically intends to injure or defraud (A) his or her employer, (B) the employer of the person to whom he or she offers, gives, or agrees to give the money or a thing of value, (C) the employer of the person from whom he or she requests, receives, or agrees to receive the money or a thing of value, or (D) a competitor of any such employer."

17

"'in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*Id*. at p. 576.) Substantial evidence is evidence that is reasonable, credible and of solid value, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Ibid*.)

Viewed in the light most favorable to the judgment, as required (*People v. Johnson*, *supra*, 26 Cal.3d at p. 576), there is substantial evidence that Robinson did allow Riley to charge any fee he chose in return for the numerous payments he received from Riley. The evidence showed that in at least two instances, Riley obtained a lower premium on a policy than he had originally quoted to the casino, but that instead of giving the casino the benefit of the reduction, he merely added the difference to his own fee. There is no evidence that the additional fee was justified by any additional work performed by Riley to obtain the lower premium. And, there is evidence that in at least one instance, Riley charged what would appear to be an unconscionable fee: Riley charged a fee of $1,055,000 on a premium of $1,105,000. When the amount of the fee was questioned by one of his employees, Riley replied that the client was "helping us get our agency started." There was no evidence that Robinson ever objected or sought to negotiate a more favorable deal for the casino. Rational jurors could infer from that evidence that Riley was bribing Robinson to look the other way with respect to his fees and that Robinson placed his own financial interests above those of his employer. That conclusion is further supported by the evidence that Robinson used some of the money

18

Riley gave him either to gamble or to pay off gambling debts, and that Robinson had significant expenses in connection with a divorce.

Riley contends that Robinson cannot be faulted for his lack of scrutiny because both Konchar and Brink testified that they did not ask Riley to break out his fees from the gross premium. However, the issue is not whether Robinson was negligent but whether the evidence supports the conclusion that Robinson was deliberately allowing Riley to charge excessive fees rather than protecting his employer's interests.

Defendants also contend that as long as the casino received the "full benefit of a market value bargain," there is no basis for finding them guilty of commercial bribery. They rely on *CrossTalk Productions*, *Inc. v. Jacobson* (1998) 65 Cal.App.4th 631 (*CrossTalk*) to assert that the "full benefit" formulation is the definition of injury under section 641.3. Underlying this contention is the assertion that deprivation of the full benefit of a market value bargain is the sole definition of "injure or defraud."[16] Again, this is a question of statutory interpretation.

In *CrossTalk*, the court held that the allegations of a complaint, as to which a demurrer was sustained in the trial court, did not compel the conclusion the plaintiffs had committed commercial bribery; the facts alleged did not establish that they necessarily intended to injure or defraud anyone, because "[t]he complaint does not necessarily

---

[16] Section 641.3 requires the specific intent to "injure or defraud" the employer of one of the parties to the alleged bribery. (§ 641.3, subd. (d)(3).)

19

demonstrate any intent on the part of plaintiffs that CBS not receive the full benefit of a market value bargain or that plaintiffs obtained a contract improperly." (*CrossTalk*, *supra*, 65 Cal.App.4th at pp. 643-644.) Defendants argue that there is no evidence that they acted in a way which would bring their conduct within this definition of what constitutes injury within the meaning of section 641.3, subd. (c)(3). Even if this is true, however, the definition applied by the court in *CrossTalk* is not, and does not purport to be, the exclusive definition of injury for purposes of section 641.3. Rather, it is merely the form of injury that would be required under the circumstances of that case. Section 7 of the Restatement Second of Torts defines "injury" as "the invasion of any legally protected interest of another." (Rest.2d Torts, § 7, subd. (1).) Section 641.3 does not state or imply any less inclusive definition of "injure." Accordingly, for purposes of that statute, injury to an employer includes all forms of economic loss. This would certainly include paying an insurance broker excessive fees.

Defendants also contend that there is no substantial evidence that they acted with the specific intent to harm the casino, which section 641.3 expressly does require. (§ 641.3, subd. (d)(3).) They point out that the casino received the insurance it needed, sometimes at a lower rate than other casinos were able to obtain, and that the casino was never billed for insurance it did not receive. They also contend that Riley always charged fees and commissions which were within the standards of the industry. We have not found any evidence in the record which established what the industry standard is. The evidence showed that RGA's overall profit from the Pechanga account was 20.8 percent.

20

Based on Konchar's testimony that Pechanga's current brokers charge between 15 and 20 percent fees and commissions (see fn. 5, *ante*), RGA's profit might indeed have been only slightly above industry norms, or even within them. Nevertheless, the evidence we have cited above shows that in some instances, Riley charged fees that Robinson would have challenged if he had been looking out for Pechanga's interests rather than his own. That evidence, combined with the evidence of the financial dealings between Riley and Robinson, is sufficient to support both the conclusion that Pechanga suffered economic injury and the inference that defendants specifically intended to cause that economic injury.

Defendants urge us to consider all of the favorable evidence and the weaknesses in the prosecution's case in determining whether there truly is substantial evidence of specific intent to injure or defraud the casino. Even if we view the evidence in the light most favorable to defendants—which is the opposite of the standard we actually apply (*People v. Johnson*, *supra*, 26 Cal.3d at p. 576)—however, we can at most say that reasonable minds could differ as to whether the prosecution convincingly demonstrated that defendants acted with the necessary specific intent. If our review of the record shows that there is substantial evidence which supports the judgment, we must affirm, even if there is also substantial evidence which supports a contrary conclusion and the jury might have reached a different result if it had believed other evidence. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) Accordingly, if the evidence is such that rational people could reach conflicting conclusions, there is by definition substantial

21

evidence to support the judgment.  As we have discussed above, substantial evidence supports the jury's conclusion that the course of outside financial dealings between Riley and Robinson resulted in economic loss to the casino, and that defendants colluded to profit at the expense of economic injury to Pechanga.  It is irrelevant that another jury might have entertained doubt as to their guilt.

## DISPOSITION

The convictions on counts 6, 7, 8 and 9 are reversed for insufficient evidence.  The trial court is directed to enter a judgment of acquittal on those counts and to issue amended abstracts of judgment and sentencing minutes, and to provide certified copies of the amended documents to the Department of Rehabilitation and Correction and to the parties.  The judgment is otherwise affirmed.

CERTIFIED FOR PUBLICATION


McKINSTER _____
                                                                                                        J.

We concur:


RAMIREZ _____
                        P. J.


KING _____
            J.

22